UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

**JUDGE SCHEINDLIN**

MIRCUZ PARTNERS, LLC,

**05 CV 2091**

Plaintiff

**CLASS ACTION COMPLAINT
FOR VIOLATION OF THE
FEDERAL SECURITIES LAW**

–against–

HOWARD W. LUTNICK, LEE AMAITIS,
CANTOR FITZGERALD SECURITIES,
CANTOR FITZGERALD L. P., CF GROUP
MANAGEMENT INC. and ESPEED, INC.,

**JURY TRIAL DEMANDED**

Defendants.

-------------------------------------------------------x

Plaintiff Mircuz Partners, LLC ("Plaintiff"), individually and on behalf of all other

persons similarly situated, by his undersigned attorneys, for its complaint against defendants,

alleges the following based upon personal knowledge as to himself and his own acts, and on

information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

by and through its attorneys, which included, among other things, a review of the defendants'

public documents, conference calls and announcements made by defendants, United States

Securities and Exchange Commission ("SEC") filings, wire and press releases published by and

regarding eSpeed, Inc. ("eSpeed" or the "Company") and information readily obtainable on the

Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.     This class action is brought to recover damages for all persons who purchased the securities of eSpeed, Inc. ("eSpeed" or "the Company") during the period from August 12, 2003 to July 1, 2004 (the "Class Period"). During the Class Period, the defendants touted eSpeed as an unmitigated success story, a company which had achieved record revenues and earnings and, most importantly, a company that had established its infrastructure and business model as an unqualified success in the high volume automated trading of government securities and foreign exchange. In repeated press releases, the defendants represented that the eSpeed business model was in place and performing as anticipated. The true facts were that the business model was not working, and eSpeed was losing market share to its principle competitor, ICAP Plc, and its BrokerTec division. In fact, eSpeed did not have a viable business model. This was revealed on July 1, 2004 when defendants were forced to admit that revenues, earnings and market share were decreasing, that its business plan was not working, that it was being forced to develop a new business plan and pricing structure, and its competitive efforts with respect to ICAP were not successful. In the two trading days following this announcement, eSpeed shares dropped more than $6 per share on trading volume of over 9 million shares, a loss in market value for the Company of almost $350 million. As a result of the material false positive statements made during the Class Period, class members purchased eSpeed shares at inflated prices, and as a result were damaged thereby.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, and the corporate defendants reside in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff Mircuz Partners, LLC as set forth in the accompanying certification, incorporated by reference herein, purchased eSpeed stock at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant eSpeed develops and deploys interactive vertical electronic marketplaces and related trading technology which offers traders access to liquid, efficient and neutral financial markets. eSpeed operates multiple-buyer, multiple-seller, real-time electronic marketplaces for the global capital markets, including government bond markets and other fixed income and equities marketplaces.  The Company's suite of marketplace tools provides end-to-end transaction solutions for the purchase and sale of financial and non-financial products over its global private network or via the Internet.  The Company has organized its business in four categories across multiple liquid and commoditized industries in the financial services markets. These four categories are core products, product extensions and enhancements, eSpeed Software

Solutions sales and new product rollouts.  As of September 3, 2004, eSpeed had 32,484,164 shares of Class A common stock and 23,889,270 shares of Class B common stock outstanding. The eSpeed Class A common shares trade on the NASD National Market System.  The eSpeed Class B shares do not trade.  The class A shares have one vote per share.  The Class B shares have 10 votes per share.

8.    Defendant Howard W. Lutnick is the Company's Chairman and Chief Executive Officer and its principal spokesman.  Defendant Lutnick joined defendant Cantor Fitzgerald, L.P. ("Cantor"), which directly and indirectly controls eSpeed (as described below), in 1983 and has served as President and Chief Executive Officer of Cantor since 1992.  Defendant Lutnick's company, CF Group Management, Inc., is the managing general partner of Cantor.

9.    Defendant Lee Amaitis is the Vice Chairman, Global Chief Operating Officer of eSpeed, Inc. and a director.  Defendant Amaitis has been Executive Managing Director of eSpeed International Limited since December 1999.  Defendant Amaitis has been President and Chief Executive Officer of Cantor Fitzgerald International and Cantor Fitzgerald Europe since March 1995.

10.    Defendant Cantor Fitzgerald Securities ("CFS") is a broker-dealer registered with the Securities and Exchange Commission and a member of the NASD.  It is the controlling shareholder of eSpeed by virtue of its ownership of 21.2 million eSpeed Class B shares.  It has power to direct the actions of the Company and to elect its Board.

11.    Defendant Cantor Fitzgerald L. P.  (CFLP") is the managing partner of CFS.  It has the power to direct the actions of CFS, and therefore those of eSpeed.

12.    Defendant CF Group Management Inc.  ("CFGMI") is the managing partner of CFLP, and it has the power to direct the actions of CFLP and CFS, and those of eSpeed.

Defendant Lutnick is its President and sole shareholder.

13.    During the Class Period, Defendants Lutnick and Amaitis as senior executive officers and directors of eSpeed, and defendants CFS, CFLP and CFGMI, were privy to non-public information concerning eSpeed's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

14.    Because of their possession of such information, Defendants Lutnick and Amaitis knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being misrepresented to the investing public.

15.    As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and which were publicly traded and governed by the provisions of the federal securities laws, Defendants Lutnick and Amaitis had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, and product development, and to correct any previously-issued statements which had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. Defendants Lutnick's and Amaitis' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

16.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired the securities of eSpeed during the period from August 12, 2003 to July 1, 2004 (the "Class Period"), and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, eSpeed's securities were actively publicly traded. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class, if not thousands. Record owners and other members of the Class may be identified from records maintained by eSpeed or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      whether statements made by defendants to the investing public during the

Class Period misrepresented material facts about the business, operations and products of

eSpeed; and

c.      to what extent the members of the Class have sustained damages and the

proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as

a class action.

## SUBSTANTIVE ALLEGATIONS

22.     On August 12, 2003, the Company issued a press release touting its Second

Quarter 2003 performance entitled:

eSpeed Reports "Second Quarter 2003 Fully Taxed Operating EPS

of $0.15 and GAAP EPS of $0.14

Pre-tax Operating Earnings per Share of $0.25 Increases 92 Percent
and Revenues Grow 28 Percent Year over Year

Net Operating Margins Expand to over 35 Percent

Company Significantly Improves Outlook for Full Year 2003

23.     In the press release stated, it was reported that for the Quarter ended June 30,

2003, eSpeed had revenue of $39.1 million, and fully electronic revenue of $27.5 million.

Earnings were $8.3 million or $0.15 per share. Fully electronic volume was $7.8 trillion.

Defendant Lutnick was quoted as having said:

> "Our year-over-year pre-tax operating earnings per share growth of
> 92 percent demonstrates the success of our business model. Just
> over a year ago we established our growth strategy, and we are
> delivering on that commitment to shareholders. We are
> consistently improving our profitability, this quarter delivering
> 35.5 percent operating margins, compared to the 29.6 percent
> reported last quarter, and the 24.1 percent reported a year ago."

Defendant Amaitis was quoted as having said:

> "The record US budget deficit and corresponding debt issuance
> have improved the market in which eSpeed operates. We believe
> that the increased US Treasury issuance, which began in the middle
> of the second quarter, is indicative of the expanded US Treasury
> market that is at the heart of eSpeed's core business. As the leader
> in US Treasuries, eSpeed is uniquely positioned to benefit from the
> tremendous opportunities created by this volume and issuance
> growth."

The defendants further touted eSpeed's performance:

> The Company is raising its guidance for full year 2003 net
> operating earnings to a range of $0.64 - $0.67 per share diluted and
> after-tax from $0.54 per share diluted and after-tax. eSpeed's
> improved guidance is predicated on the Company's expectation that
> average daily Federal Reserve US Treasury volume for the full year
> 2003 will be between $430 - $440 billion per day, up from the
> previous expectation of between $400 - $408 billion per day. The
> Company's guidance is based on its expectation that average daily
> Federal Reserve US Treasury volume will be between $440 - $460
> billion per day in the third and fourth quarters of 2003. eSpeed
> expects to generate pre-tax operating margins in excess of 36
> percent and incremental margins to continue to exceed 60 percent
> for the second half of 2003. For the third quarter 2003, the
> Company expects to earn in the range of $0.16 - $0.17 per share
> diluted and after-tax.

Defendant Lutnick further stated:

> "The tremendous growth in the US Treasury market and the
> success of our price improvement (PI) software in the second
> quarter resulted in a 15 percent sequential increase in both eSpeed's
> revenues and fully-electronic volume. Our increased guidance for

the third quarter is based on our expectation that we will improve our market position by outperforming the Federal Reserve US Treasury volumes and by realizing continued traction in our price improvement business, and we have already seen these improvements during the month of July. We believe our unique leadership position, at an unprecedented time of record issuance in the US Treasury markets, coupled with our ability to leverage our technology enhancements, leave us extremely well-positioned for growth throughout the remainder of 2003 and beyond."

24.    On August 23, 2004, the price of eSpeed stock rose from $22.15 from $19.95 on volume of more than 2 million shares.

25.    On November 12, 2003, the Company issued a press release touting its Third Quarter 2003 performance entitled:

> eSpeed Reports Record Third Quarter 2003 Fully Taxed Operating EPS of $0.19 and GAAP EPS of $0.17
>
> Pre-tax Operating Earnings per Share of $0.31 Increase 94 Percent and Quarterly Revenues Grow 34 Percent to $44 Million Year over Year
>
> Pre-tax Operating Margins Expand to 40 Percent
>
> Company Expects Strong Results for Full Year 2004, Guiding Fully Taxed Operating EPS of $0.80-0.84

26.    The Company reported revenues for the third quarter 2003, ended September 30, 2003, of $44.3 million. Fully electronic revenues increased to $32.3 million. Fully electronic volume for the third quarter 2003 was $9.6 trillion. The Company reported fully taxed operating income of $10.8 million, or $0.19 per share.

Defendant Lutnick was reported as having said:

> "Our strong results this quarter were primarily based on our unmatched position as the leading electronic platform in the US Treasury market. eSpeed's market position dramatically improved

as evidenced by both our volume growth outpacing that of the Federal Reserve US Treasury average daily volumes as well as the success and continued traction of our Price Improvement (PI) product enhancement. During the third quarter, we saw increases in both the number of PI users as well as the number of transactions executed using Price Improvement."

Defendant Amaitis was reported to have stated:

"Our foreign exchange product has received excellent customer feedback, and we believe it has the potential to transform the foreign exchange market by increasing efficiency and broadening market participation. We remain on target with the roll-outs of both our mortgage backed securities and interest rate swaps products which will be on traders' desktops by the end of the year."

It was also disclosed that:

The Company maintains its full year 2003 operating income guidance in a range of $0.65 - $0.67 per share diluted and after-tax, which includes actual third quarter results and guidance for the fourth quarter. Full year 2003 guidance is predicated on the expectation that average daily Federal Reserve US Treasury volume will be between $436 and $439 billion.

For the full year 2004, eSpeed expects to generate revenue in excess of $185 million and expects its pre-tax operating margins to exceed 41 percent for the full year. eSpeed anticipates that its incremental margins will exceed 75 percent for the full year 2004. Operating earnings for 2004 are expected to be in a range of $0.80 and $0.84 per share diluted and after-tax. This guidance is based on the Company's expectations that average daily Federal Reserve US Treasury volume will be between $490 and $510 billion for the full year 2004.

Defendant Lutnick was further quoted as having said:

"With impressive results so far in 2003, we are well positioned to continue our growth in 2004. We expect 2004 will be characterized by continued US Treasury market issuance with additional US Treasury benchmark issues being added, further traction in our Price Improvement and Contingent Order product enhancements as well as new applications for each of these product enhancements, and a reasonable expectation of traction in our Foreign Exchange, Equities and other new products. We look forward to extending our solid leadership position into 2004 and beyond."

The Company did report that it expected daily U.S. Treasury volume to decrease in the 4th

Quarter 2003,  and that there would be a "seasonal slowdown" due to the Thanksgiving and

Christmas holidays, and thus fewer trading days, and lower operating income.  However this was

attributed to normal seasonal variation and not to the Company's fundamental business problems

which were not revealed by Defendants:

> For the fourth quarter 2003, eSpeed expects average daily Federal Reserve
> US Treasury volume to be between $425 and $435 billion, down from the
> previously expected $440 - $460 billion. The Company anticipates that the
> seasonally slower fourth quarter, specifically due to the Thanksgiving,
> Christmas and New Year's holidays and two fewer trading days, will result
> in comparatively lower average daily volumes. For the fourth quarter
> 2003, the Company expects to generate operating income in the range of
> $0.14 - $0.15 per share diluted and after-tax.

27.     On February 9, 2004, the Company publicly announced results for the 4th Quarter

of 2003, ended December 31, 2003,  and reiterated guidance for 2004, in a press release entitled :

> Speed Reports Fourth Quarter 2003 GAAP and Fully Taxed
> Operating EPS of $0.15
>
> Fourth Quarter Pre-tax Operating Earnings per Share of $0.25
> Increase 56 Percent and Quarterly Revenues Grow 20 Percent to
> $39 Million Year over Year
>
> Company Reiterates Strong Guidance for Full Year 2004

28.     The Company reported revenues of $39.2 million.  Fully electronic revenues were

$27.7 million.  Fully electronic volume for the fourth quarter 2003 was $7.5 trillion.  The

Company earned $8.6 million, or $0.15 a share.

It was further reported in the press release that:

> The Company is maintaining its previously stated guidance for the
> full year 2004. eSpeed continues to expect to generate revenues in
> excess of $185 million and expects its pre-tax operating margins to

exceed 41 percent for the full year 2004. eSpeed anticipates that its incremental margins will exceed 75 percent for the full year 2004. Operating earnings after tax for 2004 are expected to be in a range of $0.80 to $0.84 per diluted share. This guidance is based on the Company's expectations that average daily Federal Reserve US Treasury volume will be between $490 and $510 billion for the full year 2004.

For the first quarter 2004, eSpeed expects operating earnings to be in the range of $0.18 and $0.20 per share diluted and after-tax. This guidance is based on the Company's expectations that the average daily Federal Reserve US Treasury volume will be between $480 and $500 billion for the first quarter 2004.

Defendant Lutnick was reported to have stated:

"For eSpeed, 2004 will be characterized by the increasing growth in the US Treasury market overall and eSpeed's leadership position in this market, the continued introduction and adoption of enhancements to our software and the initial roll out of new products to be traded and leveraged across the eSpeed platform. We are encouraged by the strong foundation we have built, as we position ourselves for further growth in the future."

29.      On May 3, 2004, the Company issued a press release entitled :

eSpeed Reports Strong First Quarter 2004 Fully Taxed Operating EPS of $0.19 and GAAP EPS of $0.18

First Quarter Pre-tax Operating Earnings per Share of $0.31 Increase 72 Percent and Quarterly Revenues Grow 31 Percent Year over Year to $44.6 Million

Company Reiterates Guidance for Full Year 2004

30.      The Company reported revenues of $44.6 million for the first quarter 2004 ended March 31, 2004.  Fully electronic revenue was $30.5 million.  Fully electronic volume for the first quarter 2004 was $8.3 trillion.  Earnings were $10.7 million or $0.18 per share.

Defendant Lutnick was reported to have stated:

"We are proud to have reported strong top and bottom line results

this quarter. Our pre-tax operating margin of over 40 percent for
the first quarter clearly demonstrates the strength and leverage of
our business model."

Defendant Amaitis was reported to have stated:

"The continued success of our Price Improvement product
enhancement was illustrated in the solid growth we saw this
quarter in both revenues and volumes. We will continue to add
value to our clients' execution capabilities with the introduction
this quarter of our product enhancement Better Fill. We are excited
to be able to offer additional proprietary trading tools that can
improve the quality of our customers' trade executions and their
profitability."

          *     *     *

"We are aggressively launching new products including repos, and
while we are in the early stages of these initiatives, we are pleased
to offer increased transparency into our new product volumes. As
expected, no single new product has yet reached traction, but we
are encouraged by our results over the last two quarters."

The Company further reported:

The Company is maintaining its previously stated guidance for the
full year 2004. eSpeed continues to expect to generate revenues in
excess of $185 million and expects its pre-tax operating margins to
exceed 41 percent for the full year 2004. eSpeed anticipates that its
incremental margins will exceed 75 percent for the full year 2004.
Operating earnings after tax for 2004 are expected to be in a range
of $0.80 to $0.84 per diluted share. This guidance is based on the
Company's expectations that average daily Federal Reserve US
Treasury volume will be between $490 and $510 billion for the full
year 2004.

For the second quarter 2004, eSpeed expects operating earnings to
be in the range of $0.19 to $0.20 per share diluted and after-tax.
This guidance is based on the Company's expectations that the
average daily Federal Reserve US Treasury volume will be
between $490 and $510 billion for the second quarter 2004.

Defendant Lutnick was reported to have further stated:

> "As we look ahead for the rest of 2004, we remain confident in
> eSpeed's leadership position in US Treasuries, continue to have
> high expectations about the increased acceptance of our product
> enhancements, and are committed to successfully rolling out new
> products. To further ensure our success, we have strengthened our
> management team with the additions of Kevin Foley, our new
> President, and Paul Saltzman, our new Chief Operating Officer.
> With Kevin's extensive career that has been focused largely on the
> convergence of financial products and trading technology, along
> with his expertise in foreign exchange and equities, and Paul's
> relationships and experience in the fixed income markets, they are
> uniquely qualified to make a significant contribution toward our
> growth in new products and in our company.

31.     On May 4, 2004, eSpeed shares closed at $18.22 up from the close on May 3,

2004, of $17.43, on volume of 634,000 shares.

32.     On May 4, 2004, the defendants held an Analysts Conference. In the Conference,

Defendant Amaitis referred to ICAP's acquisition of BrokerTec, and the agreement by which

BrokerTec capped commissions, and stated:

> The end of this quarter saw our market position decline slightly.
> We believe the decline *was due to the one-time acquisition related
> volume incentives paid to the owners of our competitor.* From what
> we understand these volume incentives ended in May of 2004
> around the one year anniversary of the acquisition. Once this short-
> term effect has passed we expect our market position to improve.

Defendant Lutnick reaffirmed second quarter guidance of operating earnings of $0.19 to

$0.20 per share.  The Company also stressed that its propriety trading products would cause

trading volumes to increase:

> Now, let's update our product enhancements and some of our new
> product initiatives. Price improvement usage continued to grow in
> the first quarter. We estimate that more than 20% of our trades
> contained some degree PI in the first quarter '04 and now over 30%
> of our users are using price improvement regularly. Better Fill,
> which is our trading through the stack functionality facilitates
> execution at multiple prices while respecting the exclusive time of

14

current traders. It allows for execution against limit orders in the book behind the best bid and offer without waiting for a current trade to clear. Geared toward program and high volume traders Better Fill offers enhanced trading execution, increased efficiency and better trading opportunities to our customers. We are rolling out Better Fill to our customers this week and we will continue to roll out over the balance of the second quarter. As with PI we expect trading volumes to increase as more and more customers become comfortable with the new software and begin to rely on this proprietary trading tool. As adoption of this innovative product catches on we expect eSpeed's profitability and market position to grow. In the often run and when issued, the advent of Better Fill enhances our contingent order software. We now have a superior set of technological tools in place to build liquidity, in the often run and when issued markets. On the new product front, we rolled out U.S. treasury repo's in early April. Repo's are repurchased agreements which refer to the borrowing and lending of treasury securities. The eSpeed system offers an anonymous platform for lenders and borrowers to find one another. Gather regarding repo's will be reported with our new product volume in our second quarter results.

32.     On May 10, 2004, the Company issued a press release announcing the interim appointment of Jay Ryan as Chief Financial Officer, replacing Jeffrey Chertoff who was resigning to "pursue other opportunities." The press release stated in relevant part:

> "eSpeed has experienced tremendous growth since its inception, and we believe our future growth into new products and services is best served with a CFO who is exclusively responsible for the Company's financial operations. We are fortunate to have an experienced and accomplished financial manager of Jay Ryan's caliber join our executive team in the interim," said Chairman and CEO Howard W. Lutnick. He added, "We'd like to sincerely thank Jeff for his work and contributions over the past two years, and wish him the best in his future endeavors."

33.     On May 11, 2004, eSpeed shares closed at $18.75 up from the close on May 10, 2004, of $17.58, on volume of 584 thousand shares.

34.     On July 1, 2004 the Company issued a press release admitting that eSpeed's

business was not progressing as previously represented. Characterized as an "update" of financial expectations for the second quarter ended June 30, 2004, the Company announced that it expected to report net income in the range of $0.15 to $0.16 per share for the second quarter 2004, and revenue in the range of $42 to $43 million. Fully electronic revenue was expected to be in the range of $28 to $29 million, and fully electronic volume was expected to be $8.0 trillion.

35.    Defendant Lutnick stated:

> "Our weaker than expected performance during the second quarter was due to erosion of our market position from competitive pricing pressure and lower than expected market volumes in Europe. We are proactively addressing our market position, by offering tailored and flexible solutions that have the effect of driving down the marginal costs of trading on eSpeed. We are focusing on a revenue growth strategy that offers our customers the combination of variable and fixed commissions and value-added trading tools."

36.    The market reacted swiftly to eSpeed's about face. On July 1, 2004, the next trading day, the share price dropped 25 percent, from $17.46 to $13.01 on volume of over 6 million shares. The drop continued on July 3, 2004, as the stock fell to $11.39 a share on volume of 2.8 million shares.

37.    In an Analysts' Conference on July 2, 2004, defendant Lutnick represented that the downturn in the Company's revenues and earnings for the second quarter of 2004 were principally attributable to a special deal which ICAP had with customers which capped those customers' costs at fairly low trading level and then allowed them to trade for free. As a result, ICAP took trading volume from eSpeed. Defendant Lutnick reiterated that this special deal which ICAP customers had expired, and therefore it would not affect eSpeed in the future.

> With respect to our market share, as we mentioned on our last conference call, during the second quarter, we were impacted by

one-time acquisition related volume incentives paid to the former owners of our competitor. These incentives had a greater impact than we anticipated in May and although our market share improved in June, we were still below our expectation. Also during the second quarter, we saw lower-than-expected market volumes in Europe. This market softness impacted our voice revenue and associated volumes and earnings

38.    In the aftermath of the analysts conference on July 2, 2004, It was reported on

CBS Marketwatch that analysts were unconvinced that eSpeed's explanations made sense, or that

ICAP's market share advantage had ended.  The article stated in relevant part:

> If eSpeed is to fight off rivals in electronic bond trading, Chairman and Chief Executive Howard Lutnick must find a way to grow the company's market share without trimming profits, analysts said Friday.
>
> "At this point, it's a problem in search of a solution," according to Jeffries and Co. analyst Charlotte Chamberlain.
>
> The company, a pioneer in electronic bond trading, warned Thursday that it's losing market share at an alarming rate amid a price war with competitor ICAP BrokerTec.
>
> What's more, Lutnick's attempt to calm investors' distress appeared to fall on deaf ears, as eSpeed (ESPD) shares slipped more than 25 percent Friday.
>
> "With respect to our market share, as we mentioned on our last conference call, during the second quarter we were impacted by one-time acquisition-related volume incentives paid to the former owners of our competitor," the chief executive said in a statement Thursday. "These incentives had a greater impact than we anticipated in May, and although our market share improved in June, we were still below our expectation."
>
> ICAP acquired BrokerTec in May 2003, and at that time the banks that sold it agreed to generate at least $61.3 million a year in commissions for the merged company, while in return their commissions were capped at $97.5 million for up to three years..
>
> Lutnick, who is also chairman and chief executive of Cantor Fitzgerald, frustrated some analysts in a conference call Friday, saying he failed to lay out a feasible plan to aggressively compete with ICAP on pricing and product offerings.
>
> He declined to give any estimates for Treasury bond issuance next

year -- despite the fact that Cantor has an extensive research department dedicated in large part to estimating new issuance, the bread and butter of the two businesses.

"[Lutnick] had nothing to say about that, that's just not credible. The problem is these are things that he should have at the tips of his fingers: 'What is your research department saying about issuance?'" Chamberlain said.

"Some of the frustration might have been just due to a lack of information on some of the details," Merrill Lynch's Colin Clark added.

**Lower market share, issues in Europe:**

The trading technology firm lowered its second-quarter profit forecast due to lost market share and lower than expected European trading volumes.

"Our weaker than expected performance during the second quarter was due to erosion of [eSpeed's] market position from competitive pricing pressure and lower than expected market volumes in Europe," Lutnick asserted.

The profit warning came despite the fact that bond trading volumes during the quarter were strengthening, and even with some analysts expecting a drop in market share, they expected the growing market to justify earnings expectations.

"The challenge to the company's market share in recent quarters was cause for concern, but we believed this was only minor if [eSpeed] was able to maintain a smaller piece of a growing market with innovative and higher-margin products," Keefe Bruyette and Woods analysts wrote in a research report Friday.

**But apparently that's not what's happening:**

Analysts indicate eSpeed is losing market share and income because of ICAP's commission limits. As bond trading volume rose in the quarter, those fee caps kicked in earlier in each of the three months in the quarter, driving business to ICAP.

Also, eSpeed has initiated new fees in the last year to pay for added value for customers, but it's far from clear these are as attractive as the company expected. ICAP's pricing, with its fee caps, may be attracting high volume customers, while eSpeed's new charges may be hurting the company's volumes.

"The magnitude of the market share deterioration was more than expected. There's been more clarity surrounding the issue of fee

caps, and [on] the need to address that issue and possibly adopt similar pricing structures," Merrill's Clark said.

**Structural concerns:**

Dealing primarily in benchmark government bonds sold constantly by the U.S. Treasury to fund deficits, eSpeed offers electronic trading in those securities, but does not offer trading in so-called off-the-run and when-issued securities.

"That's where they're losing market share, because they don't have a viable product in this ancillary market," Jeffries' Chamberlain noted.

Analysts had been expecting record U.S. deficits, and the government's need to fund them by issuing Treasurys would help eSpeed maintain profit growth, even amid a shrinking market share.

"However, given the erosion of its core product segment, our previous thesis -- that 2004 earnings per share will be driven by a large deficit and therefore record U.S. Treasury volumes -- has unwound as eSpeed could not maintain its market share and take advantage of this favorable environment," Sandler O'Neill analyst Rich Repetto said Friday.

39.   On August 5, 2004, eSpeed reported its disappointing revenues and earnings for the second quarter of 2004. The Company reported revenue of $42.8 million. Second quarter 2004 fully electronic revenues were $29.2 million. eSpeed reported net income of $9.0 million, or $0.16 per share. Fully electronic volume was $8.0 trillion.

40.   On August 6, 2004, the Company held an Analysts Conference. The Company admitted that it was revamping its pricing structure to a mostly fixed pricing model, from the prior structure consisting of a low fixed price component and a higher variable pricing component. In addition, the Company advised that it would custom tailor its pricing to each customer. In addition, the Company stated that it would hire more experienced sales personnel with a greater component of fixed compensation, and, as a result that marketing costs would rise.

41.    On November 4, 2004, the Company announced financial results for the third quarter of 2004.  It reported revenues of $39.8 million and fully electronic revenue of $25.5 million, and earnings per share of $0.10.  Fully electronic volume was $6.9 trillion, down significantly form previous quarters.

42.    On January 4, 2005, the Company announced that it would remove the Price Improvement Feature ("PI") feature from its system.  PI allowed traders to advance their position by offering a slighter higher bid or asked.  PI had been previously touted as one of the features which made eSpeed better than it s competitor. eSpeed stock has not recovered.  It presently trades at approximately $10 per share.

43.    The statements set forth in paragraphs 21 through 34 are materially false and misleading, because, contrary to defendant's representations, they knew that eSpeed was not successfully competing with ICAP, that eSpeed's market share was declining, that ICAP was taking market share from eSpeed, and that eSpeed's pricing model was driving customers to its principal competitor. The defendants' claims that eSpeed's pricing model which included variable pricing and added value such as Price Improvement was successful was materially false, when the true facts were that its pricing model did not operate to drive customers to eSpeed but to its competitor ICAP.  eSpeed was eventually forced to scrap its pricing structure and abandon the Price Improvement feature.

## SCIENTER ALLEGATIONS

44.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

45.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the individual Defendants.

46.     At all relevant times, the market for eSpeed securities was an efficient market for the following reasons, among others:

(a)     eSpeed stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, eSpeed filed periodic public reports with the SEC and the NASDAQ;

(c)     eSpeed regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     eSpeed was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for eSpeed securities promptly digested current information regarding eSpeed from all publicly-available sources and reflected such

information in eSpeed stock price. Under these circumstances, all purchasers of eSpeed securities during the Class Period suffered similar injury through their purchase of eSpeed securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

48.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of IAC who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Against
### Defendants eSpeed, Lutnick and Amaitis

49.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.    During the Class Period, defendants carried out a plan, scheme and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase eSpeed securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

51. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for eSpeed securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of eSpeed as specified herein.

53. These defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of eSpeed value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about eSpeed and its business operations and future prospects in the light of the circumstances under which they were made, not

misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of eSpeed securities during the Class Period.

54.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing eSpeed operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of eSpeed securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of eSpeed publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired eSpeed securities during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that eSpeed was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their eSpeed securities, or, if they

had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5.

58.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of The Exchange Act**
**Against the Defendants Lutnick, Amaitis CFS, CFLP and CFGMI**

59.

60.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.    Defendants Lutnick and Amaitis acted as a controlling persons of eSpeed within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and knowledge of the Company's operations and knowledge of the false statements disseminated to the investing public, Defendants Lutnick and Amaitis had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Defendants Lutnick and Amaitis had unlimited access to copies to the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.    Defendants CFS, CFLP and CFGMI acted as controlling persons of the Company.

By virtue of their ownership and/or voting control of stock sufficient to elect the eSpeed Board, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

63. As set forth above, Defendants eSpeed, Lutnick and Amaitis each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Lutnick, Amaitis, CFS, CFLP, and CFGMI are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

2. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

26

Dated: New York, New York
February 14, 2005

                                        PASKOWITZ & ASSOCIATES

                                        By: _____
                                        Laurence D. Paskowitz (LP 7324)
                                        60 East 42nd Street
                                        46th Floor
                                        New York, NY 10165
                                        (212) 685-0969 (tel.)
                                        (212) 685-2306 (fax)


                                        **OF COUNSEL:**

                                        ROY JACOBS & ASSOCIATES
                                        Roy L. Jacobs (RLJ 0286)
                                        60 East 42nd Street
                                        46th Floor
                                        New York, NY 10165
                                        212-867-1156
                                        212-504-8343 (Fax)

                                              and

                                        Greenwich Legal, LLC
                                        180 Mason Street
                                        Greenwich, CT 06830
                                        203-622-6000
                                        203-622-1383 (Fax)

# EXHIBIT A

# EXHIBIT A

**PLAINTIFF'S CERTIFICATE**

Mircuz Partners, LLC ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint against eSpeed, Inc., and certain other defendants, and authorizes its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff represents and warrants that it is fully authorized to enter into and execute this certification though its undersigned managing partner.

5.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6.    Plaintiff has made no transaction(s) during the Class Period in the common shares of eSpeed, except those set forth below:

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 3/5/04 | 40 | $19.59 | | None | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

7.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

8.    I declare under penalty of perjury, this _10_ day of February, 2005 that the information above is accurate.

_____
Managing Partner