UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------X
           :

In Re ESPEED, INC. SECURITIES    :   **OPINION AND ORDER**
LITIGATION                     :

             :

             :   **05 Civ. 2091 (SAS)**

--------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

Two movants seek to be named lead plaintiff in a class action

litigation involving alleged securities fraud by eSpeed, Inc. ("eSpeed"). Movants

are (1) the "Adib Group," composed of Shabbir Adib, his family and Mike Weber;

and (2) The Greater Pennsylvania Carpenters Pension Fund (the "Pension Fund").

Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the Adib

Group is hereby appointed as the presumptive lead plaintiff.[1]

## II. BACKGROUND

Plaintiffs are investors who purchased eSpeed stock during the class

period, from August 12, 2003 to July 1, 2004. The first-filed complaint alleges that

plaintiffs sustained losses as a result of false and misleading statements made by

eSpeed about the company's profitability and future stock prospects during this

---

[1]    *See* 15 U.S.C. § 78u-4.

1

period. eSpeed publicly asserted that the company's business plan was proceeding successfully, but, in fact, profitability was decreasing, competitors were eating into market share and eSpeed's initiative to tailor pricing to individual clients was proving to be a failure. On July 1, 2004, eSpeed disclosed its true financial condition and, as a result, eSpeed shares dropped more than $6 per share over a two day period, causing substantial losses to numerous investors.[2]

## III. LEGAL STANDARD

In determining which plaintiff to appoint as lead plaintiff, the PSLRA sets forth a required procedure.[3] The lead plaintiff should be the plaintiff "most capable of adequately representing the interests of class members."[4] The PSLRA requires that the "most adequate plaintiff" be determined by a two-step competitive process.[5]

The first step establishes as presumptive lead plaintiff the "person or group of persons" who meet(s) the following three criteria: (1) the candidate must

---

[2]     *See* Complaint ¶ 1.

[3]     *See* 15 U.S.C. § 78u-4(a)(3)(B).

[4]     15 U.S.C. § 78u-4(a)(3)(B)(i).

[5]     *See* 15 U.S.C. §§ 78u-4(a)(3)(B)(iii).

have "filed the complaint or made a motion in response to a notice;"[6] (2) the candidate must have "the largest financial interest in the relief sought by the class,"[7] and (3) the candidate must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."[8]

Once the presumptive lead plaintiff has been designated, the court conducts a second inquiry in which members of the class have the opportunity to rebut the chosen lead plaintiff's presumptive status. In order to rebut the designation, class members must prove either that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class."[9] If the presumptive lead plaintiff is disqualified on these grounds, the candidate's position is forfeited and the court returns to the first phase to determine a new presumptive lead plaintiff. The process repeats itself until a candidate succeeds in both the first and second phases of inquiry.

## IV. DISCUSSION

---

[6]     15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa).

[7]     15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb).

[8]     15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).

[9]     15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa), (bb).

## A. Shabbir Adib's Standing

The Adib Group is composed of five individual investors: Mike Weber, Shabbir Adib ("Adib"), Ruby Adib (Adib's wife), Hatim Adib (Adib's father), and Murtuza Tofafarosh (Adib's cousin).[10] Plaintiffs Adib and Weber request to be named lead plaintiffs – Weber on behalf of himself and Adib on behalf of his family as "akin to an investment advisor."[11] While it is dubious that being "akin to" an investment advisor should allow an individual to sue on behalf of a collection of investors, I do not reach this issue because even were Adib a bona fide investment advisor, he would not have standing to sue on behalf of his family. In order for an investment advisor to attain standing on behalf of investors the transactions in question must have been executed as if by a single person.[12] Moreover, the advisor must be the attorney in fact for his clients, and he must be granted both unrestricted decision-making authority and the specific right to

---

[10]    *See* Reply Declaration of Laurence D. Paskowitz [counsel for Adib] in Support of Motion by Shabbir Adib and Mike Weber for Appointment as Lead Plaintiff ("Paskowitz Reply Decl.") at 1.

[11]    Memorandum of Law for Appointment of Lead Plaintiffs and Lead Counsel by Shabbir Adib and Mike Weber ("Adib Mem."), at 2 n.3.

[12]    *See Smith v. Suprema Specialties, Inc.*, 206 F. Supp. 2d 627, 634 (D.N.J. 2002) ("While some courts have permitted 'investment managers' to serve as lead plaintiffs, those courts generally have required showings that such money managers qualify as a 'single person' under the Reform Act.").

recover on behalf of his clients.[13] Adib has not adequately established that he meets these conditions.

However, while Adib lacks standing to sue on behalf of his family as an investment advisor, such standing is not necessary in order for the Adib Group to be named lead plaintiff. The group is not required to suggest individual members as lead plaintiffs; rather, the group itself, governed by the individuals within it, may be named the lead plaintiff.[14]

## B. The Validity of the Adib Group

The lead plaintiff determination does not depend on the court's judgment of which party would be best lead plaintiff for the class, but rather which

---

[13]     *See Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 255 (S.D.N.Y. 2003) ("When the investment advisor is also the attorney-in-fact for its clients with unrestricted decision making authority, the investment advisor is considered the 'purchaser' under the federal securities laws with standing to sue in its own name."); *see also In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 CV 2166, 2004 WL 3314943, at *5 (N.D. Ohio May 12, 2004) ("A number of district courts have held that an investment manager has standing to bring securities claims on its clients' behalf if it is the clients' attorney-in-fact and has specific authority to recover its clients' investment losses."); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 358 (S.D.N.Y. 2002) (holding that investment advisor must be attorney-in-fact for his clients in order to act as lead plaintiff on their behalf).

[14]     *See In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998) (appointing a group of three individual investors as lead plaintiff).

candidate fulfils the requirements of the Act.[15] The PSLRA does not,

unfortunately, define what constitutes an appropriate candidate. The Act states that

the court must "appoint as lead plaintiff the *member* or *members* of the purported

plaintiff class that the court determines to be most capable of adequately

representing the interests of class members" but the Act does not specify whether

the "members" must be related in some fashion in order to qualify as an

appropriate lead plaintiff group.[16]

     Courts are divided on the issue. Two cases in the Southern District of

New York forcefully assert that unrelated investors may not band together for the

purpose of achieving lead plaintiff status, reasoning that investors with no prior

relationship will not be as effective at controlling class counsel as would a single

institutional entity.[17] Other cases, comprising the majority view, hold that

---

[15]    *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) ("While the words 'most capable' seem to suggest that the district court will engage in a wide-ranging comparison to determine which plaintiff is best suited to represent the class, the statute defines the term much more narrowly.").

[16]    15 U.S.C. § 78u-4(a)(3)(B)(i) (emphasis added).

[17]    *See In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) ("Given, moreover, that the Azimut Group has no independent existence and its composite members have no prior relationship, there is nothing to suggest that they will collectively ride herd on counsel anywhere as well as could a single sophisticated entity."); *see also Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997) ("To allow an aggregation of unrelated plaintiffs to serve

unrelated investors may aggregate under certain circumstances.[18] One court even

goes so far as to argue that "a greater number of plaintiffs allows them, as a group,

to wield more control over counsel."[19] For the most part, in the absence of explicit

limits "the lead plaintiff decision must be made on a case-by-case basis, taking

account of the unique circumstances of each case."[20] Generally, a lead plaintiff

group should be held to a reasonable number, so that the group does not become

too unwieldy.[21] This logic eschews "a hard-and-fast rule," instead adopting a "rule

---

as lead plaintiffs defeats the purpose of choosing a lead plaintiff.").

[18]    *See In re Oxford,* 182 F.R.D. at 42 (naming group of three unrelated individual investors as co-lead plaintiff with an institutional investor); *see also* Weltz v. Lee, 199 F.R.D. 129, 132 (S.D.N.Y. 2001) (permitting the aggregation of the losses of "group of seven unrelated" investors); *In re Star Gas Sec. Litig.,* No. 04 Civ. 1766, 2005 WL 818617, at *5 (D. Conn. Apr. 8, 2005) ("The majority of courts considering the issue have taken an intermediate position, allowing a group of unrelated investors to serve as lead plaintiffs when it would be most beneficial to the class under the circumstances of a given case.").

[19]    *In re Oxford,* 182 F.R.D. at 49.

[20]    *Id.*

[21]    *See Weltz,* 199 F.R.D. at 133 ("There are, however, outer limits to the number of plaintiffs allowed to proceed as lead plaintiff, in that there exists a point at which the Act's express purpose of placing the control of securities class actions with a small and finite number of plaintiffs (as opposed to plaintiffs' counsel) becomes wholly undermined by the sheer size of the proposed plaintiff group."); *see also Berger v. Compaq Computer Corp.,* 257 F.3d 475, 478 n.2 (5th Cir. 2001) (noting that Securities and Exchange Commission limits lead plaintiff groups to between three and five individual investors).

of reason" along with the general presumption that unrelated "groups with more than five members are too large to work effectively."[22]

The fact that the PSLRA was designed to favor institutional investors should be taken into account when determining what constitutes a reasonable group of "members."[23] Appointing a group of unrelated investors lead plaintiff could lead to fragmentation and the problem of determining whose voice reigns when the group cannot agree.[24] An institutional investor with substantial losses functioning as lead plaintiff is less likely to cause a "flurry of otherwise pointless activity" in the form of disputes within the lead plaintiff group.[25]

I conclude, therefore, that a group of unrelated investors should not be considered as lead plaintiff when that group would displace the institutional

---

[22]     *In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001).

[23]     *See In re Goodyear*, 2004 WL 3314943, at *3 ("The legislative history of the PSLRA reflects a preference for institutional investors in the lead plaintiff role."); *see also* Malasky v. IAC/Interactivecorp, No. 04 Civ. 7447, 2004 WL 2980085, at *4 (S.D.N.Y. Dec. 21, 2004) (discussing the PSLRA's preference for institutional investors); *In re Oxford*, 182 F.R.D. at 46 (same).

[24]     *See In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747, 751 (8th Cir. 2003) (discussing the problem of "what weight a district court must give to objections from a fraction of a fractured lead plaintiff group").

[25]     *Sakhrani v. Brightpoint, Inc.*, 78 F. Supp. 2d 845, 847 (S.D. Ind. 1999) (holding that appointment of "artificial group of persons as lead plaintiffs should be rare under the PSLRA").

investor preferred by the PSLRA. But where aggregation would not displace an institutional investor as presumptive lead plaintiff based on the amount of losses sustained, a small group of unrelated investors may serve as lead plaintiff, assuming they meet the other necessary requirements.

The appropriateness of the Adib Group to serve as lead plaintiff therefore hinges on a comparison between the losses of the Adib Family, Weber, and the Pension Fund. If the Adib family has greater losses than the Pension Fund even without Weber, then Weber may be included in the group and, subject to a determination that the Adib Group meets the requirements of Rule 23(a), the Adib Group will be named the presumptive lead plaintiff. If the Adib family is dependent on Weber's losses to establish aggregate losses greater than the Pension Fund's, then Weber will not be considered as part of the Adib Group, and the Pension Fund will be named presumptive lead plaintiff, assuming that it can satisfy the requirements of Rule 23(a).

## C. Comparing Financial Interest

In determining which plaintiff has the greatest financial interest in the outcome of a securities litigation, courts have looked to four factors: "(1) the number of shares purchased during the class period; (2) the number of net shares

purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered" (the "*Lax* Test").[26] Applying these factors I conclude that the Adib Group has the greatest interest in the outcome of the eSpeed litigation.

The first three factors of the *Lax* Test, examining gross purchases, net purchases, and net funds expended, lean slightly in favor of the Adib Group. The Pension Fund bought a total of 22,925 shares of eSpeed stock during the class period, whereas the Adib Group bought 22,800 shares (19,800 without Weber).[27] The Pension Fund bought 10,625 net shares during the class period, whereas the Adib Group bought 15,550 net shares (12,550 without Weber).[28] Finally, the Pension Fund expended a total of $249,378 in purchasing shares, whereas the Adib

---

[26] *Pirelli Armstrong Tire Corp. v. LaBranche & Co., Inc.,* No. 03 Civ. 8264, 2004 WL 1179311, at *7 (S.D.N.Y. May 27, 2004) (quoting *Lax v. First Merch. Acceptance Corp.,* No. 97 Civ. 2715, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).

[27] *See* Declaration of Marshall Zieses [accounting expert for the Adib Group] in Connection with the Application of the Adib Family and Mike Weber to be Appointed Lead Plaintiffs ("Zieses Decl.") ¶ 5 at table A, The Number of Shares Purchased During the Class Period; *see also* Movant's Purchases, Sales and Losses, Ex. B to Declaration of Mario Alba, Jr. [counsel for the Pension Fund] in Support of Motion to Appoint Greater Pennsylvania Carpenters Pension Fund as Lead Plaintiff and to Approve Lead Plaintiff's Choice of Lead Counsel ("Alba Decl.").

[28] *See* Zieses Decl. ¶ 5 at table B, The Number of Net Shares Purchased During the Class Period.

Group expended $360,418 ($298,925 without Weber).[29]  The Adib Group thus

surpasses the Pension Fund on factors two and three, but loses to the Pension Fund

on the issue of gross shares bought during the class period (all three results are the

same with or without Weber).

Because "the PSLRA expresses little guidance in prescribing a

uniform method for assessing a party's financial loss"[30] in analyzing the fourth

factor of the *Lax* Test courts must decide the best way to estimate losses, usually

choosing between two distinct accounting methods:  the "first-in, first out"

("FIFO") and the "last-in, first out" ("LIFO") techniques.  For the purpose of loss

calculation, the Pension Fund utilizes FIFO and the Adib Group uses LIFO, each

movant concluding that it has the greatest losses (whether or not Weber is included

in the Adib Group).

The FIFO method is often used by courts and the Internal Revenue

Service to determine losses for tax purposes.[31]  Further, FIFO has historically been

---

[29]     *See id.* ¶ 5 at table C, The Total Net Funds Expended During the Class
Period.

[30]     *Andrada v. Atherogenics, Inc.,* No. 05 Civ. 00061, 2005 WL 912359,
at *3 (S.D.N.Y. Apr. 19, 2005).

[31]     *See Thompson v. Shaw Group, Inc.*, No. Civ.A. 04-1685, 2004 WL
2988503, at *4 (E.D. La. Dec. 14, 2004).

the preferred method of calculating losses "where shares of stock cannot be identified with any particular lots purchased."[32]

But more recently, courts have preferred LIFO and have "generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases."[33] Moreover, in a number of instances where courts have used FIFO to calculate financial loss, they have done so reluctantly.[34] LIFO, by contrast, has been used not only for lead plaintiff calculations, but also to determine compensation amounts for stockholders suffering losses due to securities fraud.[35]

The main advantage of LIFO is that, unlike FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to the

---

[32] *Helvering v. Campbell*, 313 U.S. 15, 20-21 (1941).

[33] *In re Cable & Wireless, PLC Sec. Litig.*, 217 F.R.D. 372, 378-79 (E.D. Va. 2003).

[34] *See In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 303 (S.D. Ohio 2005) (criticizing the FIFO technique but adopting it grudgingly because the plaintiffs had not provided enough information to conduct a LIFO analysis); *see also Thompson*, 2004 WL 2988503, at *2 n.3 ("This figure is calculated under the 'first-in/first-out' methodology ('FIFO') whose accuracy in measuring the genuine financial interest is questionable.").

[35] *See SEC v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937, 2005 WL 217018, at *7 (S.D.N.Y. Jan. 31, 2005) (using LIFO rather than FIFO to determine compensation amounts for stockholders suffering losses during class period).

inflation of the stock price.[36] FIFO, as applied by the Pension Fund and others, ignores sales occurring during the class period and hence may exaggerate losses.[37]

An analysis of the Pension Fund's loss as calculated by the Pension Fund demonstrates why FIFO (as applied by the Pension Fund) is inferior to LIFO. In order to arrive at its alleged loss, the Pension Fund sums up the cost of the purchases it made during the class period, and then subtracts from that sum the money it gained back immediately following the class period through the sale of the same number of shares. Specifically, the Pension Fund bought 22,925 shares of eSpeed stock during the class period for a total investment of $494,839.37.[38] Following the class period, from July 6 to August 6, 2004 the Pension fund sold the same number of shares, gaining back $271,870.23.[39] The Pension Fund's FIFO method of analysis subtracts the later sales from the earlier purchases for a loss of

---

[36] *See Thompson,* 2004 WL 2988503, at *4 ("Under the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an off-set of class-period gains from a plaintiff's ultimate losses.").

[37] *See Andrada,* 2005 WL 912359, at *4 (holding that FIFO was an inappropriate method of calculating loss where the plaintiff was a net seller of stock during a period in which the stock price was fraudulently inflated).

[38] *See* Movant's Purchases, Sales and Losses, Ex. B to Alba Decl.

[39] *See id.*

13

$222,969.14.[40]

This analysis ignores that the Pension Fund also sold shares of eSpeed stock during the class period, when the price was inflated. Whereas all the Pension Fund's sales after the class period were made at around $12 per share, sales during the class period were made at between $15 and $27 per share.[41] Thus the Pension Fund's losses due to eSpeed's alleged fraud were actually somewhat cushioned by the sales made when eSpeed's stock price was high, sales that are not taken into account by the Pension Fund's application of FIFO.

By contrast, the Adib Group's utilization of LIFO reflects offsetting "gains" that were attained through the sale of stock during the class period. This method matches the last purchases made during the class period with the first sales made during the class period.[42] Subtracting the sales from the purchases, the Adib Group arrives at its base class period losses. Then, shares that were bought during the class period but were not sold during the class period are accounted for as if

---

[40]     *See id.*

[41]     *See id.*; *see also* Securities Transactions, Ex. A to Alba Decl. (summarizing transactions of the Pension Fund).

[42]     *See* LIFO Analysis for Greater Pennsylvania Carpenters Pension Fund, Ex. I to Opposition of Shabbir Adib and Mike Weber to the Motion for Appointment as Lead Plaintiff of the Greater Pennsylvania Carpenters Pension Fund ("Adib Opp.").

they had been sold at the average price of the shares in the 90 calendar days following the class period.[43] Adding the losses incurred during the class period to the unrealized losses that would have been incurred had the Adib Group sold their remaining stock at the average price immediately following the class period, the Adib Group arrives at its final calculation.[44] On this method of analysis, the Adib Group lost $166,743 without Weber (or $196,795 with him), and the Pension Fund lost $121,264.[45] Because this method contemplates the offsetting gains the parties collected during the class period, it is a better measurement of the true damages sustained by the plaintiffs.

Thus the Adib Group has greater losses than the Pension Fund, with or without Weber. Consequently, Weber may be included in the Adib Group as his exclusion has no material affect on the lead plaintiff determination.

## D. Applying the Requirements of Rule 23

---

[43]    *See* LIFO Analysis for Adib Family, Adib Opp. at Ex. I; *see also* 15 U.S.C.A. § 78u-4(e)(1) (using as a benchmark for damages on the purchase of a security "the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market").

[44]    *See* LIFO Analysis for Greater Pennsylvania Carpenters Pension Fund, Ex. I to Adib Opp.

[45]    *See* Zieses Decl. ¶ 5 at table D, Losses Suffered Utilizing the LIFO Method.

Having established that the Adib Group has the greatest losses, the next question is whether the Adib Group "otherwise meets the requirements of Rule 23(a)."[46] This analysis need not be as complete as would a similar determination for the purpose of class certification.[47] At the lead plaintiff stage of the litigation, "the party moving for lead plaintiff of the consolidated action need only make a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23."[48] As I noted in *In re Initial Public Offering Securities Litigation,*

> Typicality is satisfied where the claims arise from the same conduct from which the other class members' claims and injuries arise. . . . The adequacy requirement is satisfied where (1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the class has a sufficient interest in the outcome of the case to ensure vigorous advocacy.[49]

---

[46]     *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).

[47]     *See In re Crayfish Co. Sec. Litig.*, No. 00 Civ. 6766, 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002) ("The Rule 23 inquiry under §§ 77z-1(a)(3)(B)(iii)(I)(cc) is less stringent than the inquiry the rule otherwise requires.").

[48]     *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y. 1998).

[49]     *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 121 (S.D.N.Y. 2002) (considering typicality and adequacy in the lead plaintiff appointment context).

Members of the class claim to have been injured by a fraudulent inflation of eSpeed's stock price; the Adib Group makes the same claim.[50]  The Adib Group therefore meets the Rule 23 typicality requirement for the purpose of the lead plaintiff inquiry.[51]

Additionally, the Adib Group meets the Rule 23 requirement that the lead plaintiff have the capacity to adequately represent the class.[52]  The Adib Group's counsel is experienced in class action litigation and has the ability to conduct the litigation effectively.[53]  There is no reason to believe that members of the Adib Group have interests that are antagonistic to each other, because all allege significant damages due to eSpeed's actions.[54]  Given these damages, I find that

---

[50]    *See* Adib Mem. at 2.

[51]    *See In re Oxford*, 182 F.R.D. at 50 (establishing that typicality is satisfied where a lead plaintiff group's "claims and injuries arise from the same conduct from which the other class members' claims and injuries arise"); *see also Smith*, 206 F. Supp. 2d at 632 (same).

[52]    *See* Fed. R. Civ. P. 23(a)(4).

[53]    *See* Adib Mem., App. A., Paskowitz & Associates Firm Resume.

[54]    *See* Declaration of Shabbir Adib, Ex. A to Paskowitz Reply Decl. (certifying trades made by Adib); *see also* Declaration of Murtuza Tafafarosh, Ex. B to *id.* (certifying trades made by Adib); Declaration of Hatim Adib, Ex. C to *id.* (certifying trades made by Hatim Adib); Ex. F to Motion for Appointment of Lead Plaintiffs and Lead Counsel by Shabbir Adib and Mike Weber ("Adib Motion") (certifying trades made by Mike Weber).

the Adib Group has enough of an interest in the outcome of the eSpeed litigation to ensure that it will vigorously advocate on behalf of the class.

## V. CONCLUSION

Having determined, pursuant to the PSLRA, that the Adib Group is the entity with the greatest losses, has submitted a timely motion requesting to be named lead plaintiff,[55] and that the Adib Group furthermore meets the requirements of Rule 23(a), the Adib Group is appointed the presumptive lead plaintiff in the eSpeed litigation. Members of the class now have the opportunity to present evidence, if they wish, in an attempt to rebut the Adib Group's presumptive status.[56] If no evidence is submitted or the evidence submitted is inadequate to rebut the presumption, the Adib Group will be named as the lead plaintiff. The Clerk is directed to close the motions of the Adib Group and the Greater Pennsylvania Carpenters Pension Fund for appointment as lead plaintiff [docket numbers 7 and 10]. A conference is scheduled for 4:30 PM on Tuesday, July 19, 2005, in courtroom 15C.

---

[55]    *See* Adib Motion.

[56]    *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 13, 2005

19

**For Plaintiffs:**

Laurence D. Paskowitz, Esq.
Paskowitz & Associates LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 685-0969

Roy L. Jacobs, Esq.
Roy Jacobs & Associates LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 867-1156

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mario Alba, Jr., Esq.
Lerach Coughlin Stoia Geller Rudman & Robin LLP
200 Broadhollow Road, Suite 406
Melville, New York 11747
(631) 367-7100

Christopher J. Gray, Esq.
Law Office of Christopher J. Gray LLP
460 Park Avenue, 21st Floor
New York, New York 10022
(212) 838-3221

Lionel Z. Glancy, Esq.
Michael Goldberg, Esq.
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067

(310) 201-9150

Eric J. Belfi, Esq.
Paul T. Curley, Esq.
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, New York 10016
(212) 682-1818

Louis F. Burke, Esq.
Louis F. Burke LLP
460 Park Avenue, 21st Floor
New York, New York 10022
(212) 682-1700

**For Defendant:**

Dennis P. Orr, Esq.
Joseph De Simone, Esq.
Matthew Ingber, Esq.
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, New York 10019
(212) 506-2500