UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X
                                              :
In re ESPEED, INC. SECURITIES     :          OPINION AND ORDER
LITIGATION                                   :
                                              :
THIS DOCUMENT RELATES TO:     :          05 Civ. 2091 (SAS)
ALL ACTIONS                              :
                                              :
---------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This putative class action is brought on behalf of certain purchasers

of common stock in eSpeed, Inc. ("eSpeed"), a publicly-traded market leader in

electronic bond trading.  Plaintiffs allege violations of sections 10(b) and 20(a) of

the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by

the Securities and Exchange Commission ("SEC").[1]  All defendants now move to

dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For

the following reasons, defendants' motion is granted with leave to replead.

However, I grant leave to replead with some reluctance.  After

reviewing the pleadings in this case, I harbor grave doubts as to whether plaintiffs

can ever allege facts sufficient to survive a motion to dismiss.  The fact that

---

[1]      15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5).

-1-

eSpeed introduced a new product that ultimately failed, despite cautious optimism from defendants and apparent initial success in raising eSpeed's revenues, does not entitle eSpeed's investors to use the federal securities laws as a "scheme of investor's insurance."[2] In light of this, plaintiffs should not file an amended Complaint unless they reasonably believe that the deficiencies identified in this Opinion can be addressed.

## II.    BACKGROUND

### A.    The Parties

Plaintiffs are a group of investors who bought eSpeed stock during the putative class period, which is "purchasers of eSpeed securities from November 20, 2002 through July 1, 2004."[3] Defendant eSpeed "operates multiple-buyer, multiple-seller, real-time electronic marketplaces for the global capital markets, including government bond markets and other fixed income and equities

---

[2]    *Basic Inc. v. Levinson*, 485 U.S. 224, 252 (1988) (White, J., concurring in part and dissenting in part). *Accord Dura Pharm. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 1634 (2005) ("*Dura*") (Rule 10b-5 actions are not intended to provide investors with a "partial downside insurance policy").

[3]    Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") ¶ 2. I previously appointed the following lead plaintiffs: Michael Weber, Shabbir Adib, Ruby Adib, Hatim Adib and Murtuza Tofafarosh (collectively, the "Adib Group"). *See In re eSpeed Inc. Sec. Litig.*, 232 F.R.D. 95 (S.D.N.Y. 2005).

marketplaces."[4]  eSpeed is a subsidiary of the bond trading firm Cantor Fitzgerald Securities, Inc. ("Cantor"), which "has long been a dominant player in the field of government bond trading."[5]

Plaintiffs also name four individual defendants.  Howard W. Lutnick is eSpeed's Chairman and CEO, and also serves as President and CEO of Cantor.[6] Lee M. Amaitis is Vice Chairman, Global Chief Operating Officer and a director of eSpeed.[7]  Jeffrey M. Chertoff was Senior Vice President and CFO of eSpeed from May 2002 to May 2004.[8]  Joseph Noviello has been eSpeed's Executive Vice President and Chief Information Officer since September 2001.[9]

**B.     The Founding of eSpeed**

According to plaintiffs, while Cantor trades in other forms of fixed income securities, its "bread and butter has remained U.S. treasury securities."[10]

---

[4]     Complaint ¶ 18.

[5]     *Id.* ¶ 2.

[6]     *See id.* ¶ 19.

[7]     *See id.* ¶ 20.

[8]     *See id.* ¶ 21.

[9]     *See id.* ¶ 22.

[10]    *Id.* ¶ 32.

Until relatively recently, the modalities of treasury securities trading were quite antiquated, relying largely on voice trades and centralized trading pits.[11] Consequently "[i]nformation regarding prices was difficult to obtain, and execution of trades often proved to be a slow process."[12] Beginning in the early 1990s, Cantor strove to develop fully automated electronic trading systems which would provide more rapid and less expensive trades.[13] The result of this effort was eSpeed, which officially commenced operations in March 1999 and completed an initial public offering ("IPO") in December of that year.[14] The IPO prospectus mentioned that among eSpeed's possible competitors was a then-proposed electronic trading network called BrokerTec.[15]

eSpeed's first full year as a public company was a success – its $118.9 million of revenue for the year 2000 "far exceeded earlier projections."[16] eSpeed's impressive growth continued throughout 2001, even after 658 Cantor

---

[11]   *See id.*

[12]   *Id.*

[13]   *See id.*

[14]   *See id.* ¶¶ 33-34.  Lutnick and Amaitis were heavily involved in eSpeed's founding.  *See id.* ¶ 33.

[15]   *See id.* ¶ 34.

[16]   *Id.* ¶ 36.

employees (including 180 who worked for eSpeed) died in the September 11, 2001 terrorist attacks.[17] Despite this catastrophe, eSpeed achieved profitability for the first time in the fourth quarter of 2001.[18] Although eSpeed continued to be profitable in 2002, the market began to grow disenchanted with its performance.[19] At the same time, BrokerTec emerged as a dangerous competitor for eSpeed's core government securities trading business. After struggling throughout 2000 and 2001, BrokerTec merged in August 2002 with the London-based ICAP.[20] The merger gained approval from the U.S. Department of Justice in May 2003, and the two companies' operations were fully integrated by the end of 2003.[21]

### C. The Alleged Scheme

---

[17]    *See id.* ¶ 50. eSpeed and Cantor shared office space on the top floors of the World Trade Center. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Def. Mem.") at 4 (citing Complaint ¶ 37).

[18]    *See* Complaint ¶¶ 37-38; *see also id.* ¶ 37 ("[Cantor and eSpeed] were able to continue in business [after September 11] largely due to the electronic trading capabilities that had been developed at eSpeed.").

[19]    *See id.* ¶ 39.

[20]    *See id.* ¶¶ 42-46. While the merged company is called ICAP BrokerTec, *see id.* ¶¶ 48, 50 (referring to BrokerTec's "acquisition" by ICAP); *id.* ¶ 81 (referring to "competitor ICAP BrokerTec"), the Complaint refers to the merged company as BrokerTec, and for clarity this Opinion adheres to that usage.

[21]    *See id.* ¶ 49.

### 1. Price Improvement

In mid to late 2002, with its stock price languishing, eSpeed sought to "reinvigorate its growth rate."[22] To this end, eSpeed developed Price Improvement ("PI"), "a new trading option . . . purportedly designed to help bidders get better trade executions in exchange for payment of considerably higher commissions."[23] The gravamen of plaintiffs' allegations is that throughout the putative class period, defendants described PI in a falsely positive light, despite their knowledge *first*, that their customers' response to PI was uniformly hostile, and *second*, that PI was a failure that would (and did) cause customers to defect *en masse* to BrokerTec as soon as it became a viable alternative.[24]

The putative class period begins on November 20, 2002, soon after "eSpeed began to advise its customers about the general contours of [PI], due to be put in place in early 2003."[25] Plaintiffs assert that the impressions of eSpeed's seven hundred customers were accurately portrayed by a November 20, 2002 article in *Dow Jones Capital Markets Report*, entitled "Traders Cry Foul Over

---

[22]    *Id.* ¶ 40.

[23]    *Id.*

[24]    *See id.* ¶¶ 6-7.

[25]    *Id.* ¶ 50.

eSpeed's New Bond Broking Service" ("Traders Cry Foul Article").[26] This article, based on interviews with some of eSpeed's customers, reported that:

> [eSpeed] is facing harsh criticism from some of its biggest Wall Street customers over a new feature that allows traders to trump the bids and offers of other market participants in return for a higher commission. The controversial feature, named 'Price Improvement,' is part of eSpeed's new software release [which] allows traders to leapfrog – as many as three times – past competing traders in a lineup of bids and offers. The trader who does so pays an incrementally higher commission with each jump if the trade is completed . . . .Though [PI] promises bigger per-trade commissions for eSpeed on those trades where it is used, the strategy could ultimately backfire . . . .[27]

The article also reported that "traders and managers at several large Wall Street bond desks say the new feature has made them less apt to trade on eSpeed because of the higher cost of accessing the best prices."[28] Similarly, a Columbia University professor interviewed for the story asserted that "[a]s an

---

[26]    *See id.* The full article was submitted as Exhibit G to the 11/16/05 Affidavit of Joseph De Simone, counsel for defendants ("De Simone Aff.").

[27]    Complaint ¶ 50 (quoting Traders Cry Foul Article).

[28]    *Id.* "'eSpeed is trying to change the rules of trading for their own benefit by forcing people to pay higher commissions to get liquidity. It's not fair, and I have moved almost all my business off eSpeed' said a trader in two-year Treasury notes. Nine traders and fixed income managers at primary dealer banks [who are the biggest players in the interbank market serviced by eSpeed and other interdealer brokers] were interviewed for this story. . . . All of these people spoke critically of the changes to eSpeed." *Id.*

economist, I don't see why the rest of the players should agree to incentive pricing like this, and I guess they don't want to, based on the complaining."[29]

In response, Lutnick (in the words of the article) "attributed [customer] criticism to a natural resistance to change that he believes will pass once traders discover how the new feature improves their access to prices."[30] The company also equated complaints about PI to "the initial distaste shown for electronic trading when it emerged in the late 1990s."[31] "'Price [I]mprovement, by its definition, will create better opportunities for traders to get a better price than they initially put into the system,'" said Lutnick. "'In time, traders will wonder how they ever lived without this.'"[32]

"In the three trading days after Lutnick's statements were published in *Dow Jones Capital Markets Report* (and [] repeated in the *Wall Street Journal*), eSpeed's stock price rose approximately 15%."[33] Several other articles from late 2002 and early 2003 also discuss customer doubts regarding PI, as well as

---

[29]    *Id.*

[30]    *Id.*

[31]    *Id.*

[32]    *Id.*

[33]    *Id.*

eSpeed's assurances that such doubts would fade once PI's benefits became manifest.[34]

PI was "formally put into use" in January 2003.[35] Plaintiffs assert that after the launch, "defendants [] embarked upon a sustained scheme of misrepresentation," the goal of which was to mislead the market into believing that PI was winning over customers and adding value to eSpeed's services.[36] Plaintiffs proffer two confidential witnesses to establish that defendants had information to the contrary. The first witness ("CW-1") was employed as a

___

[34]   Defendants cite several articles expressing customers' skepticism towards PI, including: Steven Vames, *Online Treasury Broking Thrives, As Do Industry Battles*, DOW JONES CAPITAL MARKETS REPORT, Dec. 18, 2002, Ex. E to De Simone Aff. (asserting that PI "has drawn a backlash from eSpeed's customers"); Stephen Vames, *Cantor eSpeed Unit Faces Criticism – Some Customers of Service Complain About Feature On Trumping of Trades*, WALL ST. J., Nov. 21, 2002, at C14, Ex. H to De Simone Aff. (asserting that "people at several large Wall Street bond desks said [that PI] has made them less apt to trade on eSpeed"); Heather Bandur, *Bond Traders Say eSpeed's Pricing System is Unfair, WSJ Reports*, BLOOMBERG NEWS, Nov. 21, 2002, Ex. I to De Simone Aff. (PI's "pay-to-play" rule has "discouraged" some bond traders from using eSpeed); Stephen Vames, *eSpeed Expands Controversial New Bond Broking Service*, DOW JONES INT'L NEWS, Jan. 9, 2003, Ex. J to De Simone Aff. (quoting a government bond trader as saying "[n]o dealer has asked for [PI] . . . the only thing it does is increase the commission we pay on trades"; article also asserts that "[c]riticism aside, [PI] is seen by industry observers as one way the company is trying to add value in an industry that has matured at a swift pace in recent years.").

[35]   Complaint ¶ 55.

[36]   *Id.* ¶ 51.

-9-

customer account executive throughout the class period.[37] His job was to explain PI to approximately forty customers and solicit feedback.[38] "CW-1 reports that customer reaction was uniformly negative from the beginning, and that this did not change later on."[39]

The complaints heard by CW-1, in sum, revealed that customers "viewed [PI] as a nearly useless system that was merely a subterfuge for raising commissions."[40] CW-1 was in a position to report these findings directly to Lutnick, and he did so.[41] Nevertheless, Lutnick continued to "misrepresent[] the benefits of [PI] and the level of customer acceptance on public conference calls."[42] "Lutnick also misrepresented throughout the Class Period that customers were opting to use [PI] of their own volition, when, in fact, they were often coerced into

---

[37]     See id. ¶ 52.

[38]     See id.

[39]     Id. ¶ 53.

[40]     Id.  Specifically, "large customers complained that, under Price Improvement, they often had to pay triple the usual commission merely to stay even with other market players."  Id.  And "[c]ustomers also felt that they often had to use Price Improvement because if they did not do so their orders would receive discriminatory treatment."  Id.

[41]     See id. ¶¶ 52-53.  Plaintiffs do not specify how or where CW-1 informed Lutnick of his findings.

[42]     Id. ¶ 53.

-10-

using it through the threat of disadvantageous [trade] executions."[43]

Plaintiffs' second confidential witness ("CW-2") was employed throughout the class period in eSpeed's Desktop Support and as a field technician, where he fielded complaints about PI on a daily basis.[44] CW-2 asserts that PI was an "unmitigated disaster from day one."[45] Specifically, CW-2 relays that he received up to one hundred complaints regarding trade executions "on an average bad day," and that customers believed they were essentially forced to use PI.[46] Moreover, eSpeed did not provide CW-2 with the necessary information to adequately explain PI to complaining customers, and this "fueled customer anger."[47] Finally, CW-2 asserts that, during client visits, he personally observed clients installing the necessary hardware to use BrokerTec instead of eSpeed.[48]

Plaintiffs also assert that BrokerTec emerged as a formidable

---

[43]    *Id.*

[44]    *See id.* ¶ 54.

[45]    *Id.*

[46]    *Id.*

[47]    *Id.*

[48]    *See id.*

competitor for the first time in late 2003.[49]  According to plaintiffs, BrokerTec's rise "rendered eSpeed increasingly vulnerable to competitive forces because eSpeed had adopted the odious [PI] system to artificially boost revenues, while BrokerTec simply set reasonable prices for trades."[50]

### 2.    Materially False Statements

In light of the foregoing, plaintiffs allege that all defendants' statements regarding PI were materially false and misleading for several reasons. *First*, defendants knew that their customers hated PI because it "hiked commissions considerably, provided little or nothing in the way of price improvement, did not work well . . . and was tantamount to . . . blackmail since those who did not opt for [PI] saw their trades fall behind in priority."[51]  *Second*, eSpeed aimed to produce short-term unsustainable revenue increases because any increase in revenues attributable to PI was simply the result of forcing customers to use a product they hated.[52]  *Third*, PI generated a "never-ending barrage" of complaints, fielded by inadequately-trained employees who could not resolve

---

[49]     *See id.* ¶ 70.

[50]     *Id.*

[51]     *Id.* ¶ 57.

[52]     *See id.*

customer concerns.[53] *Finally*, defendants concealed from the market the fact "that PI could be imposed on unwilling customers only for so long as no other trading firm had sufficient depth to draw these customers away."[54]

Plaintiffs allege that the campaign of misrepresentation began with Lutnick's comments quoted in the Traders Cry Foul Article. According to plaintiffs, he "had no reasonable basis to believe that customers would 'wonder how they lived without' [PI], as it was (i) adverse to their interests; (ii) increased their costs; (iii) did not provide . . . 'price improvement' (iv) complicated and slowed trades; and (v) was viewed as an extortionate method of raising commissions without providing a concomitant benefit."[55]

During a February 11, 2003 conference call to discuss eSpeed's fiscal year 2002 results, Amaitis stated that PI "is new technology . . . out for just over a month, and the marketplace is growing accustomed to it. All the traders are learning . . . how to improve their business on using the new software. We're excited about the prospects. So far, so good. Everybody has been anxiously using

---

[53]     *Id.*

[54]     *Id.*

[55]     *Id.* ¶ 51.

it and learning how to use the technology."[56]  Chertoff echoed these comments:

"[PI] should not only increase revenue on transactions that are utilized, but should

over time be a competitive benefit in that it shows we have better prices on our

screen than alternative marketplaces."[57]  Chertoff also expressed optimism as to

PI's future: "It is fair to say the feature is [already] being actively used . . . we

think that [PI] will become over time, a natural . . . part of the treasury trading

business, but with only one month under our belt . . . so far, so good."[58]

Lutnick was similarly upbeat on a May 13, 2003 conference call:

"[w]e have hundreds of traders enjoying the benefits of PI and dozens of traders

using PI literally for every single trade they do. . . .We released our PI software in

January of 2003 and it continues to gain great traction."[59]  In an August 12, 2003

company press release, Lutnick boasted that the "tremendous growth in the US

Treasury market" and the "success of our [PI] software" combined to produce a

fifteen percent increase in both eSpeed's revenues and fully-electronic trading

---

[56]     *Id.* ¶ 55.

[57]     *Id.* ¶ 56.  At the same time, he cautioned that "you know, it is still
[the] early days.  I can't put more color on it. [PI] is one of the many factors that
[factor into eSpeed's earnings and revenue guidance]." *Id.*

[58]     *Id.*

[59]     *Id.* ¶ 58.

-14-

volume from the first quarter 2003 to the second quarter.[60] The next day, Lutnick stated on a conference call that PI has become "successful," that it "continues to gain traction," and that "it is obvious that eSpeed [benefitted] from . . . successful introduction of our [PI] software."[61]

On November 13, 2003, Lutnick told analysts that PI was a "growth driver," which in the third quarter of 2003 "continued to gain traction with both the number of users and amount of usage per trader."[62] Lutnick also asserted that "PI is already an integral part of the way traders trade."[63] He also agreed with an analyst's comment that PI was the sole reason for eSpeed's increasing revenues

---

[60] *Id.* ¶ 60. Lutnick also stated that eSpeed's increased earnings guidance for the third quarter of 2003 was based in part on the expectation that PI would "realize[] continued traction." *Id.*

[61] *Id.* ¶ 62. Lutnick also asserted that eSpeed's "increased profitability" will derive from both "increased market position" and the "increased success of our price improvement power." *Id.* On the same call, Amaitis stated that he was "[e]xtremely encouraged by . . . the early stages of PI's introduction into the market . . . already many users have opted for system level PI which means that eSpeed's computers maxi[mize] our customer's participation in each trade while minimizing the cost of such participation." *Id.* Novellio similarly extolled PI during an October 1, 2003 conference call, stating that PI has met with "widespread adoption" by customers, and it was an example of the "innovative solution[s]" produced by collaboration of eSpeed's product development and software engineering teams. *Id.* ¶ 64.

[62] *Id.* ¶ 67.

[63] *Id.*

-15-

and market share in the third quarter of 2003.[64]

The upbeat statements about PI continued into 2004. Lutnick reiterated on a February 10, 2004 conference call that he expected PI to "continue to grow."[65] On May 3, 2004, Amaitis was quoted in a company press release as attributing eSpeed's revenue growth for the first quarter 2004, in part, to the "continued success of our [PI] product enhancement."[66] When analysts expressed concern about eSpeed's deteriorating market position on May 4, 2004, Lutnick insisted that BrokerTec was gaining market share merely because of a temporary incentive promotion.[67]

### 3. The End of Price Improvement

On July 1, 2004, the last day of the putative class period, eSpeed shares closed at $17.46 per share.[68] After the markets closed that day, eSpeed

---

[64]     *See id.* ¶ 68.

[65]     *Id.* ¶ 71. During the same call, Chertoff soothed analysts' worries about slippage in eSpeed's market share by asserting that the slippage was a one-quarter event, and claimed that PI would continue to grow. *See id.*

[66]     *Id.* ¶ 73.

[67]     *See id.* ¶ 74. Plaintiffs allege that in fact, Lutnick knew that the real reason for eSpeed's deteriorating position was that its customers were fed up with PI and were consequently defecting to BrokerTec. *See id.* ¶ 75.

[68]     *See id.* ¶ 79.

issued a press release "update" of financial expectations for the second quarter which ended on June 30, 2004.[69] This release disclosed that eSpeed expected to report net income from $0.15 to $0.16 per share for the second quarter of 2004, and revenue between $42 and 43 million.[70] These results disappointed the market; eSpeed shares plunged twenty-five percent, to $13.01 per share on July 2, 2004, and to $11.39 per share on July 3.[71] The July 1 release quoted Lutnick as follows:

> Our weaker than expected performance during the second quarter was due to erosion of our market position from competitive pricing pressure and lower than expected market volumes in Europe. We are proactively addressing our market position, by offering tailored and flexible solutions that have the effect of driving down the marginal costs of trading on eSpeed. We are focusing on a revenue growth strategy that offers our customers the combination of variable and fixed commissions and value-added trading tools.[72]

During a July 2, 2004 conference call, Lutnick denied an analyst's suggestion that eSpeed's loss of market share was caused by customer "animosity" towards PI.[73] According to *CBS Marketwatch*, "Lutnick frustrated some analysts

---

[69]     *See id.* ¶ 78.

[70]     *See id.*

[71]     *See id.* ¶ 79.

[72]     *Id.* ¶ 78.

[73]     *See id.* ¶ 80.  Plaintiffs assert that after eSpeed's disappointing quarterly results, "the market now understood the truth: eSpeed's slavish adherence to a system detested by its customers might have produced artificial

-17-

in [the July 2 conference call], saying he failed to lay out a feasible plan to aggressively compete with [BrokerTec] on pricing and product offerings."[74] On August 6, 2004, eSpeed announced that it was "revamping its pricing structure to a mostly fixed pricing model, from the prior structure consisting of a low fixed price component and a higher variable pricing component."[75]

eSpeed announced the end of PI on January 4, 2005. Paul Saltzman, eSpeed's Chief Operating Officer, stated that the elimination of PI was "a result of extensive discussions and feedback from our clients."[76] A January 17, 2005 article in *Securities Industry News* noted that "users have complained that the system, initiated in 2002, was expensive, provided little benefit, and slowed down execution."[77] According to Saltzman, "By making the system simpler and faster, it will draw liquidity to the system. . . . Over time, we expect our market share to

---

short-term gains, but had finally resulted in a material decline in eSpeed's financial performance. Indeed, the 'competitive pricing pressure' referred to by defendant Lutnick was actually the reality of customers stating their preference for BrokerTec's user-friendly pricing system versus the unworkable and unpopular Price Improvement system." *Id.*

[74]     *Id.* ¶ 81.

[75]     *Id.* ¶ 83.

[76]     *Id.* ¶ 85. Saltzman was hired in June 2004. *See id.* ¶ 89.

[77]     *Id.* ¶ 86.

increase."[78]  eSpeed's new CFO Jay Ryan stated on March 1, 2005, "[r]emoval of [PI] has been very well-received by customers."[79]  And eSpeed President Kevin Foley stated on May 10, 2005 that eSpeed's trading volume "grew because of our new customer pricing and the removal of [PI]."[80]

A "detailed analysis of eSpeed's business" in the August 15, 2005 edition of *Forbes* magazine asserted that "[c]lients hated [PI].  In the 18 months after introducing the gimmick, eSpeed lost an estimated 20 percentage points of market share. . . . Traders credit Saltzman with persuading Lutnick (after seven months of pleading) to drop [PI].  'When we had the time and the resources to listen to our customers, we removed it,' Saltzman says."[81]

### 4.  Scienter Allegations

Plaintiffs assert that "[t]he ongoing fraudulent scheme described in this Complaint could not have been perpetrated . . . without the knowledge and complicity of the personnel at the highest level of the Company, including the

---

[78]     *Id.*

[79]     *Id.* ¶ 87.

[80]     *Id.* ¶ 88.

[81]     *Id.* ¶ 89.

Individual Defendants."[82] Plaintiffs also allege that defendants Amaitis and Noviello completed three "unusual" stock sales between them during the class period. Amaitis sold a total of 93,750 shares of eSpeed stock on December 12 and December 15 of 2003, for gross proceeds of $2,207,000.[83] After selling these shares, Amaitis still held 103,512 shares.[84] Noviello received $593,000 from a sale of 25,000 shares of eSpeed stock on December 20, 2003, leaving him with only 2,331 shares.[85] Neither defendant had bought or sold any eSpeed stock during the prior two years.[86]

## III. LEGAL STANDARD

### A. Standard of Review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

---

[82]     *Id.* ¶ 92.

[83]     *See id.* ¶ 93.

[84]     *See id.* At this time, Amaitis also held 962,500 stock options, of which 340,000 were immediately exercisable. *See* eSpeed's 2003 Form 10-K, filed with the SEC on 3/15/04 at 27 ("2003 10-K"), Ex. B to De Simone Aff.

[85]     *See* Complaint ¶ 93. At this time, Noviello held 475,000 stock options, of which 202,500 were immediately exercisable. *See* 2003 10-K at 27.

[86]     *See* Complaint ¶ 93.

-20-

to relief.'"[87] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor.[88] Courts generally do not consider matters outside the pleadings but may consider documents attached to, referenced in, or integral to the pleadings.[89] Courts may also take judicial notice of stock prices, and press articles (for the fact of their publication).[90]

## B. Section 10 and Rule 10b-5

---

[87] *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation and citation omitted).

[88] *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 30 (2d Cir. 2004) (citation omitted).

[89] *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *see also In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 331 (S.D.N.Y. 2003). A court at the motion to dismiss stage can also consider "public disclosure documents . . . that have been [] filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527, 2003 WL 21250682, at *6 (S.D.N.Y. May 29, 2003) (citation omitted).

[90] *See In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 246 n.61 (S.D.N.Y. 2004) (stock prices); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) (citation omitted) (press articles).

-21-

## 1. Prima Facie Case

To state a prima facie case for securities fraud under section 10(b) and Rule 10b-5, a plaintiff must allege that "'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff.'"[91] The requisite state of mind, or scienter, in a securities fraud action is "'an intent to deceive, manipulate or defraud.'"[92]

Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b),[93] and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[94] To plead a material

---

[91]    *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). *Accord Dura*, 125 S. Ct. at 1631 (internal citation omitted) (basic elements of 10b-5 action are "a material misstatement or omission, scienter . . ., a connection with the purchase or sale of a security, reliance. . ., economic loss; and 'loss causation'").

[92]    *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[93]    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally." *See also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (applying Rule 9(b) standard to securities fraud claims).

[94]    Pub. L. No. 104-67, 109 Stat. 737 (1995). *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

-22-

misrepresentation or omission under the PSLRA "the complaint [must] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed."[95]  Rule 9(b) requires, among other things, "that the pleading 'explain why the statements were fraudulent.'"[96]

### 2.    **Statute of Limitations**

Section 804(a) of the Sarbanes-Oxley Act of 2002 provides that a securities fraud action "may be brought not later than the earlier of (1) two years after the discovery of the facts constituting the violation; or (2) five years after such violation."[97]  For statute of limitations purposes, discovery of the relevant facts includes inquiry notice as well as actual notice:[98]

A plaintiff in a federal securities case will be deemed to have

---

[95]    15 U.S.C. § 78u-4(b)(1)(B).

[96]    *Rombach*, 355 F.3d at 172 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Statements of opinion may be actionable if plaintiff shows that defendant did not actually believe the opinion she expressed. *See, e.g., In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

[97]    28 U.S.C.§ 1658(b).

[98]    *See Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir. 2000) (quotation and citation omitted).

> discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. . . . Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry.[99]

To be placed on such a duty of inquiry, or "inquiry notice," plaintiffs "need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them."[100] That said, available information must establish "a probability, not a possibility" of fraud to trigger inquiry notice.[101] Moreover, on a motion to dismiss, "[u]nless Defendants can produce 'uncontroverted evidence [that] irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a

---

[99] *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) (citation omitted). *Accord LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) ("If the investor makes no inquiry once the duty arises, knowledge [of the alleged fraud] will be imputed as of the date the duty arose.").

[100] *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997). *Accord Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (quoting *Dodds*, 12 F.3d at 351-52) ("'An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'").

[101] *Newman*, 335 F.3d at 194.

matter of law."[102]  The Second Circuit is "decidedly reluctant to foreclose [] claims as untimely absent a manifest indication that plaintiffs could have learned the facts underpinning their allegations" prior to the statutory limitations period.[103]

Facts triggering a duty to inquire are frequently termed "storm warnings."[104]  Once sufficient storm warnings appear, "plaintiffs must exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded.  If they fail to meet this obligation, plaintiffs will be held to have had 'constructive knowledge' of the fraud against them."[105]  A plaintiff's duty of inquiry is mitigated when "the warning signs are accompanied by reliable words of comfort from management.'"[106]  "However, reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the

---

[102]    *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 WL 2148919, at *4 (S.D.N.Y. Sept. 6, 2005) ("*Teamsters*") (quotation and citation omitted).

[103]    *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 169 (2d Cir. 2005) (emphasis omitted).

[104]    *Dodds,* 12 F.3d at 350 (citation omitted).

[105]    *Addeo v. Braver*, 956 F. Supp. 443, 449 (S.D.N.Y. 1997) (quotation and citation omitted).

[106]    *In re Alston SA*, 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005) (quoting *LC Capital Partners*, 318 F.3d at 155).

-25-

investor's concern."[107] "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on [1] how significant the company's disclosed problems are, [2] how likely they are of a recurring nature, and [3] how substantial are the 'reassuring' steps announced to avoid their recurrence."[108]

### 3. Materiality

An alleged misstatement must be material – "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."[109] A fact is considered material if there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares" of the stock.[110] Similarly, a plaintiff must show that there was a "substantial likelihood that the disclosure of [an] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

---

[107]   *LC Capital Partners*, 318 F.3d at 155.

[108]   *Id.*

[109]   *Basic*, 485 U.S. at 238 (emphasis in original). *Accord Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

[110]   *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994). *Accord Basic*, 485 U.S. at 231 (applying the materiality standard established in *TSC Indus., Inc. v. Northway Inc.*, 426 U.S. 438, 449 (1976) to Rule 10b-5 actions).

information available,"[111] and that at the time of the investment, a reasonable investor would have considered the omitted information as significant.[112]

Although the materiality question is not often amenable to disposition as a matter of law,[113] there are a few situations where it might be appropriate to dismiss a complaint on such grounds. *First*, "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation . . . numbingly familiar to the marketplace — loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."[114]

*Second*, optimistic company statements can also be rendered immaterial by the "bespeaks caution" doctrine. This doctrine provides that "certain alleged misrepresentations made in connection with the purchase or sale

---

[111]    *TSC Indus., Inc.*, 426 U.S. at 449.

[112]    *See Glazer*, 964 F.2d at 154-55.

[113]    *See, e.g., Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

[114]    *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291, 2004 WL 2210269, at *20 (S.D.N.Y. Sept. 30, 2004). *Accord Novak*, 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *Rombach*, 355 F.3d at 174 (unfocused "[e]xpressions of puffery and corporate optimism do not give rise to securities violations").

of a security are deemed immaterial as a matter of law because it cannot be said

that a reasonable investor would consider them important in light of adequate

cautionary language that is set forth in the applicable disclosure documents."[115]

When, as here:

> [P]laintiffs proceed on a fraud-on-the-market theory . . . the
> defendants' cautionary statements must be treated as if attached to
> every one of its oral and written statements. Under this reasoning,
> the Court must consider whether any cautionary language provided
> by the defendants at any time sufficiently warned of the risk of
> which plaintiffs complain.[116]

But the scope of the doctrine is limited to "prospective

representations," as opposed to representations concerning "present or historical

facts," which "cannot be cured by cautionary language."[117] "Additionally, the

cautionary language must be examined in the context of the representations to

determine whether the language warns of the specific contingency that lies at the

heart of the alleged misrepresentation."[118]

---

[115] *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 05 Civ. 3111, 2005 WL 225288, at *14 (S.D.N.Y. Feb. 1, 2005) (citing *Halperin*, 295 F.3d at 357).

[116] *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2005 WL 2277476, at *13 (E.D.N.Y. Sept. 19, 2005) (internal quotation and citation omitted).

[117] *P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).

[118] *Id.* at 97.

-28-

*Finally*, a corollary to the fraud on the market presumption, known as the "truth-on-the-market" doctrine, provides that an alleged misstatement cannot defraud the market, and is thus immaterial, when the truth of the matter is already known to the market.[119] "However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."[120]

### 4. Scienter

The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[121] "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'"[122] Facts giving rise to a strong inference of scienter can be alleged by one of two methods: the plaintiff may plead "motive and opportunity to commit fraud" or "strong

---

[119]    *See Ganino*, 228 F.3d at 167; *but see id.* ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

[120]    *Id.*

[121]    15 U.S.C. §78u-4(b)(2).

[122]    *Ganino*, 228 F.3d at 169 (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).

circumstantial evidence of conscious misbehavior or recklessness."[123]

### i. Motive and Opportunity

"Motive [entails] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while "[o]pportunity [entails] the . . . likely prospect of achieving concrete benefits by the means alleged."[124] "Motives . . . generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[125] The desire "to inflate stock prices while [defendants] sold their own shares" may support a viable claim,[126] if a plaintiff can allege that any such sales were in some way "unusual."[127] Extensive sales can be unusual, and the amount of profit and the percentage of a defendant's holdings that were sold are also relevant.[128]

---

[123] *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quotation and citation omitted). *Accord Novak,* 216 F.3d at 311.

[124] *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

[125] *Kalnit,* 264 F.3d at 139.

[126] *Id. Accord Novak*, 216 F.3d at 307.

[127] *See In re Interpublic*, 2003 WL 21250682, at *11 (citation omitted).

[128] *See In re Scholastic Sec. Litig.*, 252 F.3d 62, 74-75 (2d Cir. 2001) (courts must consider "the amount of profits from the [insider stock] sales, the portion of stockholdings sold, the change in volume of insider sales, and the

Regarding the "opportunity" prong, courts often assume that corporations, corporate officers and corporate directors would have the opportunity to commit fraud if they so desired.[129] However, opportunity to commit fraud may not exist if the alleged scheme had no chance of succeeding.[130]

## ii. Conscious Misbehavior or Recklessness

When plaintiffs have failed to plead motive and opportunity, "it is still possible to plead scienter by identifying circumstances indicating conscious behavior [or recklessness] by defendant, though the strength of the circumstantial allegations must be correspondingly greater."[131] Conscious misconduct is relatively easy to identify, "since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information . . .

number of insiders selling").

[129]     *See, e.g., In re Time Warner Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) (assuming that defendants had opportunity to manipulate company stock).

[130]     *See Shields*, 25 F.3d at 1120 (complaint "fails to allege a sufficient opportunity to derive a benefit from the [alleged scheme]: [as] the ordinary course of bank business would lead to [discovery of the scheme]"); *see also In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) (no opportunity to benefit from fraud when, even taking allegations as true, "there was never the slightest chance" that alleged scheme could have come to fruition).

[131]     *Kalnit*, 264 F.3d at 142 (quotation and citation omitted).

-31-

or knowing sale of a company's stock at an unwarranted discount."[132]

"Recklessness is harder to identify with . . . precision and consistency."[133] To allege recklessness, plaintiff must allege facts showing that the defendants' conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[134] Recklessness is adequately alleged when, inter alia, a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements."[135]

### 5. Causation

A securities fraud plaintiff must also plead both (1) that it relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities, and

---

[132] *Novak*, 216 F.3d at 308 (citation omitted).

[133] *Id.*

[134] *Rothman,* 220 F.3d at 90 (citing *Novak*, 216 F.3d at 308). The Second Circuit has also noted that "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (quotation and citation omitted).

[135] *Novak,* 216 F.3d at 308.

(2) that defendant's conduct caused plaintiff's loss at least in part.[136] These two

elements are known, respectively, as "transaction causation" and "loss

causation."[137] Loss causation refers to the requirement that a plaintiff demonstrate

that the fraudulent scheme caused her loss.[138] In the case of a 10b-5 action

---

[136]   *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir.
2001).

[137]   "Transaction causation is generally understood as reliance." *Id.* at
186. A rebuttable presumption of transaction causation may be established under
the "fraud on the market" theory, even where a plaintiff was unaware of the
fraudulent conduct at the time of the purchase or sale:

> 'The fraud on the market theory is based on the hypothesis that, in
> an open and developed securities market, the price of a company's
> stock is determined by the available material information
> regarding the company and its business. . . . Misleading statements
> will therefore defraud purchasers of stock even if the purchasers
> do not directly rely on the misstatements. . . . The causal
> connection between the defendants' fraud and the plaintiffs'
> purchase of stock in such a case is no less significant than in a case
> of direct reliance on misrepresentations.'

*Basic,* 485 U.S. at 241-42 (alterations in original) (quoting *Peil v. Speiser,* 806
F.2d 1154, 1160-61 (3d Cir. 1986)).

Pleading that defendants perpetrated a fraud on the market, therefore,
fulfills a plaintiff's transaction causation pleading requirement.

[138]   Congress codified the loss causation requirement in the PSLRA: "In
any private action arising under this chapter, the plaintiff shall have the burden of
proving that the act or omission of the defendant alleged to violate this chapter
caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §
78u-4(b)(4).

alleging a material misstatement or omission, loss causation generally requires a

plaintiff to show that her investments would not have lost value if the facts that

defendants misrepresented or omitted had been known.[139]

In *Dura*, the Supreme Court rejected the Ninth Circuit's permissive

pleading standard for loss causation, which required only that a plaintiff allege

that she bought a security at an artificially inflated price. The Court noted that:

> [I]t should not prove burdensome for a plaintiff who has suffered
> an economic loss to provide a defendant with some indication of
> the loss and the causal connection that the plaintiff has in mind.
> At the same time, allowing a plaintiff to forgo giving any
> indication of the economic loss and proximate cause that the
> plaintiff has in mind would bring about harm of the very sort the
> statutes seek to avoid.[140]

Put simply, a plaintiff must allege that "the loss [was] foreseeable and

[ ] the loss [was] caused by the materialization of the concealed risk."[141] The

Second Circuit's loss causation standard was recently summarized by this Court:

> Where the alleged misstatement conceals a condition or event
> which then occurs and causes the plaintiff's loss, it is the
> materialization of the undisclosed condition or event that causes
> the loss. By contrast, where the alleged misstatement is an

---

[139]  *See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250
F.3d 87, 96 (2d Cir. 2001).

[140]  *Dura*, 125 S.Ct. at 1634.

[141]  *Lentell*, 396 F.3d at 173 (emphasis omitted).

-34-

intentionally false opinion, the market will not respond to the truth until the falsity is revealed — i.e. a corrective disclosure.[142]

## IV. DISCUSSION

Defendants urge dismissal for a plethora of reasons: (1) this action is time-barred because plaintiffs were on inquiry notice of the alleged fraud by November 2002; (2) plaintiffs have failed to allege loss causation; (3) defendants' alleged misstatements were nothing more than non-actionable puffery; (4) the alleged misstatements were immaterial pursuant to the truth-on-the-market doctrine; (5) the statements were protected by the "bespeaks caution" doctrine; (6) scienter cannot be inferred because the alleged scheme defies economic reason; (7) plaintiffs have failed to allege motive as to any defendant; and (8) plaintiffs have failed to allege conscious misbehavior or recklessness as to any defendant.

Although this action is not time-barred, plaintiffs' allegations are insufficient in at least two respects. *First*, most of the alleged misstatements are immaterial because they are (1) puffery; and/or (2) protected by the bespeaks caution doctrine. *Second*, plaintiffs fail to adequately allege scienter.

---

[142]    *In re Initial Public Offering Sec. Litig. (Liu v. Credit Suisse First Boston Corp.)*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005). *Accord In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.") (citation omitted).

## A. Plaintiffs Claims Are Not Time-Barred

Defendants argue that plaintiffs were placed on inquiry notice by the press accounts detailing customer dissatisfaction with PI that began appearing on November 20, 2002, the first day of the putative class period and more than two years prior to the filing of the first complaint in this action. As the first Complaint in this consolidated action was filed on February 15, 2005, February 15, 2003 is the key date for statute of limitations purposes — if plaintiffs' duty of inquiry arose before that date, this action is time-barred.[143] Although defendants submit several articles published prior to February 15, 2003 that discuss PI,[144] they particularly point to the Traders Cry Foul Article featured prominently in the Complaint:

> [The Traders Cry Foul Article] not only trumpets the fact that PI 'is facing harsh criticism from some of [eSpeed's] biggest Wall Street customers,' it serves as a blueprint for the Complaint. Every allegation of fraud in the Complaint is contained in the Traders Cry Foul Article . . . it is so comprehensive that plaintiffs *could have drafted all of the allegations of wrongdoing in the Complaint*

---

[143]     Plaintiffs do not contend that they actually undertook any inquiry after defendants claim that a duty of inquiry arose; therefore, the dispositive issue is on what date that duty arose. *See, e.g., LC Capital Partners*, 318 F.3d at 154.

[144]     *See supra* note 34.

-36-

*after the publication of the article on November 20, 2002.*[145]

Defendants' argument is not persuasive for two reasons. *First,* the argument that plaintiffs could have drafted the complaint based on an article published in November 2002, before PI was even launched, is absurd, as the Complaint alleges specific misrepresentations made on the following dates: (1) 2/11/03 (conference call); (2) 5/13/03 (conference call); (3) 8/12/03 (press release); (4) 11/13/03 (statement to analysts); (5) 2/10/04 (conference call); and (6) 5/3/04 (press release). Moreover, these early articles give no indication of fraud or misrepresentations – they only convey the message that PI was a controversial new product.[146] Cases on which defendants rely involved far more specific warnings of fraud.[147]

---

[145]     Def. Mem. at 12 (citing Complaint ¶ 50) (emphasis in original, internal citation omitted).

[146]     *Cf. Fogarazzo v. Lehman Bros.*, 341 F. Supp. 2d 274, 300 (S.D.N.Y. 2004) (generalized media reports regarding research analyst fraud, not related to specific defendants or even industry-wide fraud, do not suffice to create a duty of inquiry; "[a]t most, those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal a 'probability' of fraud").

[147]     For example, *In re Global Crossing Ltd. Sec. Litig.*, 313 F. Supp. 2d 189 (S.D.N.Y. 2003), involved a newspaper article referenced in the Complaint that unequivocally suggested that "much was amiss" at Global Crossing. The article did not merely indicate general financial difficulties at Global Crossing; rather, "it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud." *Id.* at 199-200. Similarly, the storm warnings

-37-

*Second*, even assuming *arguendo* that the press articles constituted storm warnings, investors also heard contemporaneous statements from eSpeed management, asserting that the criticisms aired in the articles were merely the doubts normally expressed when confronted with revolutionary products such as PI. These statements went beyond mere expressions of hope but instead were designed to specifically address the concerns raised in the Traders Cry Foul Article and the other articles cited by defendants.[148]

In particular, Lutnick was quoted in the Traders Cry Foul Article as attributing customer unease to simply their lack of understanding of a revolutionary product, saying that, once customers grew to understand PI, "traders will wonder how they ever lived without [it]."[149] This message was reinforced in

---

available to plaintiffs in *Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006) almost precisely tracked plaintiffs' allegations. In that case, a *Fortune* magazine article triggered inquiry notice because it discussed in great detail all four of defendant's allegedly improper business practices. *See id.* at 250.

[148] *Cf. LC Capital Partners*, 318 F.3d at 155-56 (in light of storm warnings created by revelations that defendant insurance company was "under-reserving," defendant's statements that it had "paid the bill" and the problem was "now behind us" did not negate inquiry notice . . . .The 'reassuring' statements by management were [unavailing because they were] mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future.").

[149] Complaint ¶ 50.

-38-

the early days of PI by other defendants.[150]  As plaintiffs note, "[t]hese positive statements . . . were meant to – and did – temper any warning signs that may have arisen from the media coverage."[151]  Courts often decline to find that plaintiffs were on inquiry notice in the face of such "reliable words of comfort" designed to counter information that might otherwise give rise to inquiry notice.[152]

In fact, defendants even now assert that PI was in the tradition of "eSpeed's past innovations, such as electronic trading itself," where initial customer skepticism quickly melted away.[153]  Especially given this prior

---

[150]    *See id.* ¶ 55 (Amaitis, on 2/11/03: "[PI] has been out for just over a month and the marketplace is growing accustomed to it"); *id.* ¶ 56 (Chertoff, on 2/11/03: although it is still "early days" of PI, "we think that [PI] will become over time, a natural . . . part of the treasury trading business.").

[151]    Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint ("Pl. Mem.") at 10.

[152]    *In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330, 334-35 (S.D.N.Y. 2005) (rejecting defendants' argument that inquiry notice was triggered by defendants' downward revision of its subscriber numbers long before filing of complaint; "these disclosures were contravened by several allegedly false and misleading statements that could have caused a reasonable shareholder to think all was well;" for example, a defendant later stated at a shareholders' meeting that company had "very strong revenue-producing possibilities"). *Accord Sedona Corp. v. Landenburg Thalmann & Co*, No. 03 Civ. 3120, 2005 WL 1902780, at *8 (S.D.N.Y. Aug. 9, 2005) (duty of inquiry not triggered when storm warnings were tempered by defendant's specific denial of wrongdoing).

[153]    Def. Mem. at 1-2.

-39-

experience, investors in 2002 could have reasonably relied on eSpeed's assurances that customer skepticism of PI would eventually fade, thus precluding a finding as a matter of law that the press articles gave rise to a duty of inquiry.[154]

## B. Materiality

Defendants argue that, for three reasons, any misstatements or omissions made by defendants were immaterial as a matter of law. *First*, defendants contend that statements regarding PI were non-actionable puffery. *Second*, defendants invoke the bespeaks caution doctrine, noting that eSpeed repeatedly warned that (1) PI was new technology that may not catch on with the market; and (2) eSpeed would face stiff competition from a variety of competitors including BrokerTec. *Third*, defendants advance a "truth-on-the-market" defense: "customer criticism of PI – rather than being a 'secret' known only by defendants and kept from potential investors – was instead widely reported and plainly set

---

[154] *See Newman*, 335 F.3d at 194 (SEC Form 10-K disclosing large writedowns due to start-up and "inefficiency" costs did not trigger inquiry notice when defendant "provided [a] seemingly benign explanation for the writedowns;" "[s]imply because start-up related production and inefficiency costs are identified does not necessarily mean that those costs are the result of fraud."); *see also Teamsters*, 2005 WL 2148919, at *10 (prospectus supplement disclosing high delinquency rates in defendant's loan portfolios did not give rise to inquiry notice, as prospectus supplement disclosed steps to resolve problem; "[t]he suggestion that the problems could be addressed through reorganization of [defendant's] loan servicing operations could lead a reasonable investor to conclude that the problem was related to collection, rather than [the alleged fraud]").

-40-

forth in a series of articles and news releases in reputable media outlets."[155] For the following reasons, most (but not all) of the alleged misstatements are immaterial as a matter of law.

### 1. Puffery

I reject defendants' assertion that *none* of the alleged misstatements were anything more than generalized expressions of corporate optimism. Nonetheless, three of the alleged misstatements constitute mere puffery upon which no investor could have reasonably relied. Liability cannot be based on a vaguely positive statement that "[w]e're excited about [PI's] prospects. So far, so good. Everybody has been anxiously using it and learning how to use the technology."[156] Similarly, Amaitis' statement that he was "extremely encouraged" by PI's introduction, and that he "look[s] forward to growing this business as more and more users recognize PI's tremendous benefit" is non-actionable puffery.[157] Finally, the 10b-5 claim against Noviello is dismissed on this independent ground, as his non-actionable statements regarding PI's "widespread adoption," and PI as

---

[155]   Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Reply Mem.") at 15.

[156]   Complaint ¶ 55 (Amaitis, 2/11/03).

[157]   *Id.* ¶ 62 (Amaitis, 8/13/03).

-41-

an example of the "innovative solutions [produced by] the collaboration between our product development teams and our software engineering teams," are the only statements plaintiffs ascribe to him.[158]

### 2. Bespeaks Caution Doctrine

Defendants are also correct in their assertion that many of the remaining alleged misstatements are protected by the bespeaks caution doctrine, as defendants' expressed optimism regarding PI's performance was adequately tempered by cautionary language. For example, eSpeed's December 1999 prospectus stated that eSpeed "would face competition from a variety of competitors, including a proposed electronic trading network known as BrokerTec."[159] Warnings about challenges posed by eSpeed's competitors, including BrokerTec, also appeared in eSpeed's 2002 and 2003 Form 10-Ks.[160]

As for PI specifically, while defendants were consistently optimistic about its prospects throughout the putative class period, their statements were tinged with caution. eSpeed's Form 10-Ks from 2001-2003 all noted, inter alia,

---

[158]    *Id.* ¶ 64 (Noviello, 10/1/03).

[159]    *Id.* ¶ 34 (quoting prospectus).

[160]    *See* eSpeed's 2002 Form 10-K at 53, Ex. K to De Simone Aff. ("2002 10-K") (explicitly warning of challenges posed by BrokerTec-ICAP merger); 2003 10-K at 24 (same).

that "we cannot assure you that we will successfully implement new

technologies."[161] More concretely, defendants' press releases and oral statements

during the class period repeatedly cautioned investors that PI was not a sure

thing.[162] As late as May 4, 2004, Amaitis noted that "no single [new] product has

yet reached traction."[163] Thus, investors were adequately warned that PI may not

achieve the success envisioned by defendants.[164]

### 3.   Truth-on-the-Market

The foregoing analysis does not completely foreclose plaintiffs'

claims, as some of defendants' statements are statements of present or historical

---

[161]    2003 10-K at 23. *Accord* 2002 10-K at 56, 58; eSpeed's 2001 Form 10-K, Ex. L to De Simone Aff. at 67, 69.

[162]    *See* Complaint ¶ 55 (Amaitis noting that "PI is new technology" to which the marketplace is still growing accustomed); *id.* ¶ 56 (Chertoff, resisting analyst requests for a more definite statement about PI's prospects: "you know, it is still early days. I can't put more color on it); *id.* ¶ 67 (as of November 2003, eSpeed disclosed that fewer than twenty-five percent of its customers used PI).

[163]    Transcript of May 4, 2004 conference call at 33, Ex. C to De Simone Aff. This transcript may be considered because plaintiffs quote statements from the call in their Complaint. *See* Complaint ¶¶ 73-74.

[164]    *See In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1290 (D.N.M. 2002) (optimistic statements regarding new business strategy tempered by specific risk disclosures in SEC filings); *Havsy v. Just Toys, Inc.*, No. 93 Civ. 8077, 1994 WL 381447, at *3 (S.D.N.Y. July 20, 1994) (language in prospectus that "there can be no assurance that any new product line will be successful" adequately warned of risk that a product line could later fail).

-43-

fact.[165] For their "truth-on-the-market" defense, which can apply to statements of present or historical fact, defendants rely on *White v. H.R. Block, Inc.*, where the information supposedly concealed from the market (the pendency of numerous class-action lawsuits against defendant) had already been fully disclosed by court documents, press coverage, and SEC filings.[166] Thus, "the truth was all over the market," and any misstatements or omissions concerning the lawsuits made by defendants were immaterial as a matter of law.[167]

Although it is difficult to believe that investors could have been blind to the possibility that PI might fail and thereby damage the company, I cannot find the alleged misstatements immaterial as a matter of law.[168] In *White*, the allegedly

---

[165]     *See* Complaint ¶ 58 (Lutnick stating that "hundreds of traders" are *currently* "enjoying the benefits of PI"); *id.* ¶¶ 60, 66 (Lutnick ascribing eSpeed's *past* performance to success of PI); *id.* ¶ 67 (same); *id.* ¶ 68 (same); *id.* ¶ 73 (Amaitis stating that continued success of PI "*was* illustrated" by solid growth over previous quarter); *id.* ¶ 74 (Lutnick ascribing BrokerTec's increased market share over the *past* quarter to a short-term program which he claimed was ending) (emphasis added).

[166]     *See White v. H.R. Block, Inc.*, No. 02 Civ. 8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004). "Further, the truth [about the pending litigation] was available in the market with more intensity and credibility than was any purported misstatement from defendants." *Id.*

[167]     *Id.*

[168]     *See In re Globestar Sec. Litig.*, No. 01 Civ. 1748, 2003 WL 22953163, at *9-10 (S.D.N.Y. Dec. 15, 2003) (defendants unsuccessfully argued that market had already absorbed concealed information that company's

concealed information involved objective facts about pending litigation, readily available to anyone who could access public records. The market's knowledge about the litigation, notwithstanding any representations or omissions by defendants, could not reasonably be disputed.[169]

Here, by contrast, plaintiffs point to the same collection of news articles that I addressed earlier in my discussion of inquiry notice. As already noted, the bad publicity surrounding PI during its introduction to the market was counteracted by authoritative statements from defendants, assuring the market that PI would catch on once customers were educated about its benefits.[170] Thus, I

---

subscription rates would be lower than previously announced; while argument had "intuitive appeal," and court found it "hard to believe" that a reasonable investor could believe alleged misstatements concerning subscription rates, court held that "the question of whether, and when, the market had received enough information to counteract the allegedly misleading statements is best resolved on a summary judgment motion or at trial, not at this stage of the litigation").

[169] *See White*, 2004 WL 1698628, at *12-13; *see also Starr v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (alleged omissions immaterial as a matter of law, when prior company disclosures contained the precise information alleged to have been withheld); *In re Vivendi Universal S.A. Sec. Litig.*, No. 02 Civ. 5571, 2004 WL 876050, at *5 (S.D.N.Y. Apr. 22, 2004) (dismissing claim that defendant failed to disclose sales of put options to banks, when "[p]laintiffs' allegation that the put options were not disclosed to them is contradicted by the very documents they rely on in bringing their complaint").

[170] *See* Complaint ¶¶ 50, 55-56; *see also DeMarco v. Lehman Bros.*, 309 F. Supp. 2d 631, 634 (S.D.N.Y. 2004) (allegedly misleading "bullish" reports and high ratings were not rendered immaterial by skeptical language regarding the

-45-

cannot conclude *at this time* that the corrective information, here the press articles, was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements."[171] If defendants eventually discover additional disclosures counteracting defendants' statements regarding PI, summary judgment on this ground might be appropriate.

### C. Scienter

#### 1. The Alleged Scheme Does Not Defy Economic Reason

Defendants first argue that there can be no possible inference of scienter here because plaintiffs' allegations presume that defendants' behavior was irrational. "Plaintiffs' theory is that defendants repeatedly described PI in a 'falsely positive' light even though they supposedly knew it was detested by customers, provided no benefits and was doomed to fail. . . . To take such a substantial risk for almost no benefit defies economic sense."[172]

It is occasionally appropriate for a court to refuse to infer scienter,

---

company because "the very fact that, notwithstanding the skeptical language, the reports gave [the company] the highest possible 'buy' rating is tantamount to a statement that the reader of the reports should discount the skeptical language").

[171]     *Ganino*, 228 F.3d at 167.

[172]     Def. Mem. at 21.

even on a recklessness theory, when plaintiffs' allegations presume economically

irrational behavior from defendants or are otherwise illogical.[173] But it should go

without saying that, at the motion to dismiss stage, it is rarely proper for a court to

decide that a plaintiff's allegations make no sense. And here, plaintiffs'

allegations are not completely irrational.[174] This is not a case where defendants

---

[173] *See, e.g., Hampshire Equity Partners II, L.P. v. Teradyne, Inc.,* No. 04 Civ. 3318, 2005 WL 736217, at *3 (S.D.N.Y. Mar. 30, 2005) (fundamentally illogical and contradictory scienter allegations fail as a matter of law); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) (when plaintiffs' allegations contradicted the assumption that defendants would act in their own economic self-interest, "the allegations in the Complaint affirmatively refute scienter").

[174] Defendants wrongly rely on my recent decision in *GeoPharma,* where I dismissed a securities fraud action because no rational defendant could possibly have expected the alleged scheme to succeed. *See In re GeoPharma,* 399 F. Supp. 2d at 449-52. In that case, plaintiffs alleged that a pharmaceutical company intended to dramatically inflate its share price for at least five days in order to convert some of its debt and preferred stock into common stock. *See id.* at 439. The stock price would be inflated by an alleged misstatement concerning the precise nature of an FDA approval that the company had just received for one of its products. *See id.* at 438. But as an FDA approval is public information that can be quickly verified by the market, the alleged misstatement could not possibly have inflated the company's share price by the necessary amount for five days, and thus there was no basis for a strong inference that the company intended to deceive anyone by behaving so irrationally. *See id.* at 451-52. I allowed plaintiffs to replead, but dismissed the resulting amended complaint on other grounds. *See generally In re GeoPharma, Inc. Sec. Litig.,* 411 F. Supp. 2d 434 (S.D.N.Y. 2006). The amended complaint was clarified so that I concluded that there was a "marginal" chance to sufficiently inflate the share price, but I also found that the "tenuous plausibility of the alleged scheme substantially weakens the overall strength of plaintiffs' scienter allegations." *Id.* at 446-47 (citation omitted).

-47-

allegedly attempted to "conceal" information already available to the public;[175] or

where crediting plaintiffs' allegations would mean believing that defendants went

out of their way to lose vast sums of money.[176] Rather, the gravamen of plaintiffs'

allegations is that eSpeed and its officers misrepresented the true state of PI over a

two-year period. Whether plaintiffs have stated a valid *motive* for scienter

purposes is a separate question, but they have certainly alleged a campaign of

misrepresentation that could, in the abstract, rationally be expected to indefinitely

inflate eSpeed's share price.

## 2. Motive and Opportunity

Plaintiffs' motive and opportunity allegations are confined to the

stock sales of Amaitis and Noviello during the putative class period.[177] But the

---

[175] *See In re GeoPharma*, 399 F. Supp. 2d at 449-50; *White*, 2004 WL 1698628, at *9-10.

[176] *See Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (no scienter when companies alleged to know of fraud that would cause company to fail invested heavily in that company: "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621-22 (S.D.N.Y. 2005) (no scienter when "plaintiffs fail to allege facts explaining why, if it was aware of Enron's problems, [defendant] would have continued to lend Enron billions of dollars").

[177] *See* Complaint ¶ 93. Plaintiffs' argument that defendants were motivated to commit fraud because they "could have hoped to maintain the fraud in perpetuity thereby availing themselves of countless later opportunities to sell

-48-

biggest problem with these allegations is that neither Chertoff nor Lutnick (who

owned *thirty million* eSpeed shares during the putative class period) completed

any stock sales. "As [C]hairman and CEO of [eSpeed], and as the individual who

actually made most of the alleged misstatements during the class period, defendant

[Lutnick], if anyone, was surely well-positioned to reap profits from insider

knowledge."[178] For this reason, the fact that neither Chertoff nor Lutnick sold

stock during the putative class period undermines plaintiffs' motive allegations

against defendants.[179]

---

their eSpeed shares at artificially inflated prices," can be easily dismissed because
it flies in the face of this Circuit's well-established law. Pl. Mem. at 17 (citing
*Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 14-15 (D. Mass. 2004)); *but see, e.g., In
re Initial Public Offering*, 241 F. Supp. 2d at 367 ("mere ownership [of shares] in
the absence of profit-taking does not establish a motive").

[178]    *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383-84
(E.D.N.Y. 2003). *Accord In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 Civ. 8252,
1998 WL 915907, at \*4 (S.D.N.Y. Dec. 30, 1998) (inference of scienter from
some defendants' stock sales undermined when CEO and other top officers did not
sell stock during class period: "Certainly, one can assume that these high-ranking
corporate officers . . . would be part of any fraudulent scheme to benefit from
insider information through pre-emptive stock sales. The absence of sales from
these individuals, then, suggests that . . . trading by [other] defendants does not
give rise to a strong inference of scienter.").

[179]    *See Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact
that the other defendants did not sell their shares during the relevant class period
undermines plaintiffs' claim that defendants delayed notifying the public so that
they could sell their stock at a huge profit.") (quotation and citation omitted); *see
also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997)

Moreover, plaintiffs' motive allegations against Amaitis and Noviello are insufficient even when considered separately. It does not suffice to point in isolation to the combined proceeds of defendants (here, $2.8 million) and claim that this "patently significant" dollar amount alone establishes scienter.[180] The Complaint also omits necessary information concerning (1) the percentage increase in each defendants' holdings during the class period; and (2) the profit from defendants' sales.[181] In particular, plaintiffs plead that Amaitis and Noviello realized "gross proceeds" of $2.8 million, but the Complaint does not disclose whether either made any *profit* from the sales.[182]

----

(Alito, J.) (no inference of scienter from some defendant's stock sales when, inter alia, company CEO who owned thirty percent of company did not sell stock).

[180]    Pl. Mem. at 17; *but see, e.g., In re Scholastic*, 252 F.3d at 75 ("dollar amount[s] cannot be considered in isolation.  Rather the percentage of stock holdings sold may be indicative of unusual trading."); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005) ($60 million did not establish motive); *In re Keyspan Corp.*, 383 F. Supp. 2d at 383 ($60 million did not establish motive).

[181]    *See In re Regeneron Pharm.,* 2005 WL 225288, at *22 (citing *In re Scholastic*, 252 F.3d at 75).

[182]    The incomplete information in the Complaint renders particularly curious plaintiffs' assertion that defendants' use of SEC filings to calculate the magnitude of the insider selling amounts to "inappropriate factual argument." Pl. Mem. at 18.  Not only am I free to consider such documents on a motion to dismiss, but defendants correctly note that "dozens of cases dismiss[] complaints on scienter grounds where . . . stock sales were found to be *de minimis* or [where] motive allegations were undermined by increases in total holdings."  Reply Mem. at 8 n.2 (citing, inter alia, *Acito*, 47 F.3d at 54, and *Rothman*, 220 F.3d at 94-95).

-50-

Whether either defendant sold a significant percentage of his stock holdings is a closer issue. Plaintiffs allege that Amaitis sold 48% percent, and Noviello 88% percent, of their stock holdings during the putative class period.[183] These percentages, however, are inaccurate because they do not account for the stock options held by Amaitis and Noviello, which must be considered along with shares actually held in determining whether insider sales are significant.[184] When defendants' stock options are included in the calculations, not only are the relevant percentages 8.08% (Amaitis) and 4.98% (Noviello), but in fact "each of the Individual Defendants – Amaitis and Noviello included – actually *increased* their

---

[183]     *See* Pl. Mem. at 18 (citing Complaint ¶ 93). While there is no per se rule regarding what percentage of holdings must be sold before a motive is established, certain generalizations can be drawn. *See In re Initial Public Offering*, 241 F. Supp. 2d at 367-68 (citing cases) ("insider sales that represent less than ten percent of that insider's total holdings are insufficiently 'unusual' to permit an inference of scienter"); *see also Acito*, 47 F.3d at 54 (defendant's sale of eleven percent of holdings not significant under circumstances of that case).

[184]     *See Acito*, 47 F.3d at 54; *see also Rothman*, 220 F.3d at 94. Plaintiffs rely on *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999), where the court opined that "vested options are not shares" and should not be considered in determining whether an individual defendant sold a significant percentage of holdings. *Id.* at 140. But *Acito*'s holding directly contradicts this, and plaintiffs are relying on dicta because *Oxford Health Plans* held that, even considering vested options as shares, the percentages sold (ranging from eleven percent to one hundred percent) were "not insignificant." *Id.*

-51-

beneficial ownership of eSpeed stock during that time."[185]

At the same time, all stock options are not created equal. Many

courts draw a distinction between options that are vested (and thus immediately

exercisable) and those that are not. This rationale for this distinction was

explained by the Ninth Circuit:

> When evaluating stock sales . . . the proportion of shares actually
> sold by an insider to the volume of shares he *could have sold* is
> probative of whether the sale was unusual or suspicious. . . . In this
> case, we see no reason to distinguish vested stock options from
> shares because vested stock options can be converted easily to
> shares and sold immediately. Actual stock shares plus *exercisable*
> stock options represent the owner's trading potential more
> accurately than the stock shares alone. Therefore, a sale involving
> a significant portion of an insider's actual shares, but only a small
> portion of his shares and options combined, is less suspicious than
> were the insider to hold no options.[186]

The Second Circuit's view on this issue is not crystal clear. The *Acito*

court rejected plaintiffs' contention that defendant's sale of 30,000 shares

represented an unusual sale because this sale "represented less than 11% of

---

[185]    Def. Mem. 16 (citing 2002 10-K at 59-62; 2004 Form 10-K at 12-15,
Ex. A to De Simone Aff.) (emphasis in original). *See In re Bristol-Myers Squibb
Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) ("the individual defendants,
in almost every instance, *increased* their [] holdings during the Class Period – a
fact wholly inconsistent with fraudulent intent").

[186]    *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir.
1999) (emphasis added) (internal citation omitted).

-52-

[defendant's] holdings; after the sale, [defendant] owned approximately 259,000 shares and/or options of IMCERA stock," a figure that included 93,000 *unexercisable* options.[187]   However, five years later in *Rothman*, the Second Circuit approvingly noted that the lower court opinion it was reviewing only considered exercisable options.[188]   And district courts in this Circuit, even when relying upon *Acito*, often decline to consider a defendant's unexercisable options.[189]

When only shares and *exercisable* options are considered, Amaitis sold 17.4% percent of his holdings,[190] and Noviello sold 10.9% of his holdings.[191] Nevertheless, to the extent that I am not constrained by *Acito* (which would clearly lead to a finding that these sales are *de minimis*), I still find these sales insufficient

---

[187]    *Acito*, 47 F.3d at 54.

[188]    *See Rothman*, 220 F.3d at 94 (quotation and citation omitted) ("Taking into account [defendant's] vested options, he held more shares at the end of the [putative class period] than at the beginning.").

[189]    *See, e.g., In re Regeneron Pharm.*, 2005 WL 225288, at *22; *In re Keyspan Corp.*, 383 F. Supp. 2d at 383.

[190]    Prior to Amaitis' sales, he held 197,262 shares and 340,000 exercisable options, for a total of 537,262 shares he could have sold. *See* 2003 10-K at 27-29.

[191]    Prior to this sale, Noviello held 27,857 shares and 202,500 exercisable options, for a total of 230,357 shares he could have sold. *See id.*

to establish motive as to Amaitis and Noviello. Again, the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period. Given this, it is difficult to conclude that sales by two of the four defendants of less than twenty percent of their individual holdings represent such unusual selling activity as to give rise to an inference that either defendant intended to defraud investors.[192] Thus, plaintiffs have failed to allege motive and opportunity as to any defendant.

### 3. Conscious Misbehavior or Recklessness

In order to plead conscious misbehavior or recklessness, plaintiffs must "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements."[193] When such a contradiction is pled, and when the requirements of Rule 9(b) are otherwise satisfied, "the falsity and scienter [pleading] requirements are essentially combined."[194] "That is, if [the

---

[192]    *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) (failure of some individual defendants to sell stock during class period undermined plaintiffs' allegations that any defendant intended to inflate stock for personal profit).

[193]    *Novak*, 216 F.3d at 308 ("Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.").

[194]    *In re QLT Sec. Litig.*, 312 F. Supp. 2d 526, 534 (S.D.N.Y. 2004) (quotation and citation omitted). *Accord In re JP Morgan Chase*, 363 F. Supp. 2d

-54-

Complaint has] sufficiently pled facts to support scienter, [it has] also met the pleading requirements for falsity."[195]

Plaintiffs fail to point to specific reports contradicting defendants' public statements. Such lack of specificity is ordinarily fatal to a plaintiff's effort to plead scienter based on conscious misbehavior or recklessness.[196] But here, plaintiffs rely on *first*, the information relayed by CW-1 and CW-2;[197] and *second*, an assertion that "the sheer significance of PI as a business model for eSpeed – including market share, trading volume, etc. – substantiate defendants' knowledge, or recklessness in not knowing, of the customer complaints and defections to

---

at 625 (citation omitted).

[195]     *In re QLT*, 312 F. Supp. 2d at 534 (quotation and citation omitted). Thus, for purposes of this section, I assume *arguendo* that defendants' statements are otherwise actionable.

[196]     *See Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information"); *see also In re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL 314524, at *8-9 (S.D.N.Y. Feb. 10, 2006) (plaintiffs failed to plead scienter against individual defendants due to absence of allegations pointing to specific information contradicting public statements: "In broad terms, senior officers will always have 'access' to information indicative of malfeasance (if such information exists)"); *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 Civ. 4388, 2004 WL 376442, at *10 (S.D.N.Y. Feb. 27, 2004) (no inference of scienter when, inter alia, "plaintiffs have not adequately identified the reports and memoranda that ostensibly contained facts contradicting the defendants' statements").

[197]     *See* Pl. Mem. at 14-15

-55-

competing trading companies."[198]

Even assuming that their statements are otherwise reliable, plaintiffs' confidential witnesses can establish scienter only as to Lutnick and eSpeed itself. CW-1 only reported his findings to Lutnick, and CW-2 did not (as far as the Complaint alleges) report his findings to anyone.[199] Moreover, the information relayed by CW-1 is simply insufficient to establish that eSpeed or Lutnick made knowingly false statements about PI. Defendants' points are well taken that *first*, plaintiffs fail to allege *when*, or by direct quote *what*, CW-1 actually told Lutnick;" and *second*, that the negative feedback CW-1 received was from only forty customers, "a tiny fraction (6%) of eSpeed's customer base (alleged to be 700)."[200] The fact that six percent of customers disliked PI does not necessarily mean that Lutnick lacked a reasonable basis for expressing optimism about PI's

---

[198]    *Id.* at 15 n.11.

[199]    *See In re Gilat Satellite Networks*, 2005 WL 2277476, at *18 (with respect to an individual defendant's statement that company's product is "fulfilling its vision of offering high-speed internet," allegation that beta testers discovered problems with product touted by defendant did not raise scienter inference because "[t]he complaint does not allege to what extent beta testers criticized [the product], or to whom. Nor does the complaint allege the existence of any internal reports or memoranda produced by these unidentified beta testers that would indicate [the product's alleged problems].").

[200]    Def. Mem. at 19.

-56-

prospects.[201]  Finally, it is unclear whether CW-1 ever spoke to a customer who actually used PI; his information was gathered "in late 2002 or early 2003,"[202] but PI was not introduced to the marketplace until January 2003.[203]

Plaintiffs' alternative argument that defendants should be charged with knowledge of an allegedly "vital portion" of eSpeed's business such as PI is potentially meritorious.  In *Cosmas v. Hassett*, plaintiffs alleged that defendant directors falsely claimed that "[s]ales to the People's Republic of China . . . are also an important new source of revenue" for [defendant] Inflight."[204]  To plead conscious misbehavior or recklessness, plaintiffs alleged that, at the time this statement was made, defendants were aware that China had recently adopted new import restrictions that would essentially preclude new sales to China.[205]

The Second Circuit held that plaintiffs had successfully pled scienter,

---

[201]     Similarly, as defendants also note, "there are no particularized facts concerning how these customers are selected, whether they represented a random sample of customers, or whether they were eSpeed's largest or smallest customers – information that clearly would be relevant to an analysis of customer satisfaction."  *Id.* (citation omitted).

[202]     Complaint ¶ 52.

[203]     *See id.* ¶ 55.

[204]     886 F.2d 8, 10 (2d Cir. 1989).

[205]     *See id.* at 10-11.

-57-

because:

> [T]he [] complaint alleges facts from which one can reasonably
> infer that sales to [China] were to represent a significant part of
> Inflight's business. These facts [in turn] give rise to a strong
> inference that the defendants, who [were allegedly] directors of
> Inflight, had knowledge of [China's] import restrictions, since the
> restrictions apparently eliminated a potentially significant source
> of income for the company.[206]

Thus, if the subject-matter of the alleged misstatements is sufficiently "significant"

to a defendant company, it may be possible for knowledge of contradictory

information (and thus, scienter) to be imputed to individual defendants even in the

absence of specific information contradicting their public statements.[207]

Nonetheless, the Complaint is inadequate in this respect because it

does not allege that PI was so vital to eSpeed that its top officers must have known

---

[206]    *Id.* at 13.

[207]    *See also In re JP Morgan Chase*, 363 F. Supp. 2d at 628 (citation
omitted) ("When information is at the core of a company's business, it may be
properly ascribable to senior officers"); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp.
2d 208, 223 (D. Conn. 2001) (scienter adequately alleged because, inter alia, "[t]he
problems Xerox was having, the plaintiffs allege, affected the company's 'core
operations' and jeopardized the success of the company's most significant
initiative at that time"); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D.
Wash. 1998), *abrogated on other grounds by In re Silicon Graphics Sec. Litig.*,
183 F.3d at 974 ("facts critical to a business's core operations or an important
transaction are generally so apparent that their knowledge may be attributed to the
company and its key officers").

of the extent of PI's failure.[208] To the extent that this "core operations" method of

pleading conscious misbehavior or recklessness is viable after the PSLRA,[209]

plaintiffs must provide more facts to support a strong inference that any

misstatements by defendants regarding PI must have been made with scienter.[210]

---

[208] In fact, some allegations cut in the opposite direction. *See* Complaint ¶ 56 (Chertoff stating that PI is "one of many factors" affecting projections of eSpeed's future performance, and also indicating that PI is merely an *option* for eSpeed's customers); *id.* ¶ 62 (Lutnick explaining that PI is merely "an example" of various "core products" or "product enhancements").

[209] *Cosmas* precedes the PSLRA by six years, and post-PSLRA decisions in other Circuits have cast doubt on whether scienter can be pleaded in this manner. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (rejecting allegation that failure of company's core business evidences defendant's knowledge that they were misrepresenting company's prospects for success); *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 848 (9th Cir. 2003) (rejecting "core operations" method of pleading scienter in light of PSLRA).

[210] *See, e.g., In re JP Morgan Chase*, 363 F. Supp. 2d at 628 (declining to apply "core operations" doctrine when plaintiffs allege no facts suggesting that alleged fraudulent accounting "was at the core of JPM Chase's business"); *In re Federated Dep't Stores Sec. Litig.*, No. 00 Civ. 6362, 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (holding that because misrepresentations concerned "a financial factor of a subsidiary representing approximately 10% of [subsidiary's] total assets," and this factor was "not essential to the survival" of the company, knowledge of fraud could not be imputed to defendants.); *cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004) (because subject of alleged fraud was earnings restatement revealing a loss so large that company declared bankruptcy, key officers could be charged with scienter based on concealing this loss); *In re Cell Pathways Sec. Litig.*, No. 99-725, 2000 WL 805221, at *1, 7 (E.D. Pa. June 20, 2000) (misrepresentations concerned company's only drug product); *Epstein*, 993 F. Supp. at 1317 (misrepresentations involved matters "essential to the survival of the company").

-59-

Moreover, even if PI was sufficiently significant that knowledge of its true prospects can be imputed to the individual defendants, plaintiffs must still adequately allege that defendants lacked a reasonable basis for optimism about PI. Such optimism was seemingly justified for at least part of the putative class period. For example, Lutnick announced on August 12, 2003 that "the success of our [PI] software in the second quarter" contributed to a fifteen percent increase in eSpeed's revenues and electronic trading volume, and that he expected PI to contribute to higher earnings in succeeding quarters.[211]

Plaintiffs allege that this and similar statements were actionable because, inter alia, the revenue growth generated by PI was merely "artificial[] and temporary[]" and achieved at the cost of "alienating eSpeed's customers."[212] But even so, many of plaintiffs' allegations boil down to the proposition that defendants should have *anticipated* that PI would eventually damage the company, even at a time that the company was enjoying growing revenues. Such "fraud by hindsight" allegations have long been rejected.[213]

---

[211]    Complaint ¶ 60.

[212]    *Id.* ¶ 61.

[213]    *See, e.g., Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.).

## D.    Loss Causation[214]

The parties dispute whether the pleading of loss causation is governed by Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure. This is an issue left open by *Dura* and not squarely addressed by the Second Circuit. In light of the other deficiencies of the Complaint, I need not resolve this dispute now. Instead, like the Supreme Court in *Dura*, I assume *arguendo* that Rule 8(a) applies.[215] Under that standard, plaintiffs' loss causation allegations just barely suffice.[216]

Defendants contend that plaintiffs' loss causation allegations are inadequate because the twenty-five percent stock drop on July 2, 2004 was a full six months *before* the January 4, 2005 announcement that eSpeed would

---

[214]    Plaintiffs invoke the fraud-on-the-market presumption to establish transaction causation. *See* Complaint ¶¶ 94-95. Defendants do not contest this presumption's applicability here.

[215]    Plaintiffs incorrectly assert that *Dura* adopted a liberal notice pleading standard for loss causation. *See* Pl. Mem. at 27; *but see Dura*, 125 S. Ct. at 1634 (emphasis added) ("we assume, *at least for argument's sake*, that neither the [Federal] Rules nor the securities statutes impose any special further requirement [beyond Rule 8(a)] in respect to [pleading loss causation].").

[216]    Should the Second Circuit eventually hold that Rule 9 governs the pleading of loss causation, plaintiffs' loss causation allegations would *not* suffice. Plaintiffs should take this into account should they file an amended Complaint.

discontinue PI.[217] Accordingly, defendants assert that plaintiffs' allegations here are "strikingly similar" to the allegations deemed insufficient in *Dura*.[218]

In *Dura*, defendant allegedly made two distinct false statements: (1) defendant falsely represented the extent of its profits from drug sales; and (2) it also claimed that it expected the Food and Drug Administration ("FDA") to approve its new spray device to treat asthma.[219] On the last day of the putative class period, defendant announced disappointing earnings, which it specifically attributed to low drug sales.[220] The next day, defendant's shares plummeted.[221] Eight months *after* that loss, defendant announced that the FDA would not approve defendant's spray device after all.[222]

Because there was no corrective disclosure *regarding the spray device* before the economic loss occurred, the alleged deception *regarding the spray device* could not possibly have caused the economic loss:

---

[217]    *See* Def. Mem. at 24-27.

[218]    *Id.* at 26.

[219]    *See Dura*, 125 S. Ct. at 1630.

[220]    *See id.*

[221]    *See id.*

[222]    *See id.* After the disclosure regarding the spray device, "Dura's share price temporarily fell but almost fully recovered within one week." *Id.*

-62-

[T]he plaintiffs' lengthy complaint contains only one statement that we can fairly read as describing the loss caused by the defendants' 'spray device' misrepresentations. That statement says that the plaintiffs 'paid artificially inflated prices for Dura's securities' and suffered 'damage' . . . however, the 'artificially inflated purchase price' is not itself a relevant economic loss. And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's 'spray device.'[223]

As *Dura* reaffirms, it is axiomatic that "[a] concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."[224] But the Complaint gives rise to an inference, albeit a weak one, that by the end of the class period, investors connected eSpeed's loss of market share and financial decline to the rejection of PI by eSpeed's customers.

Under the heading "The Truth Is Disclosed," plaintiffs allege that on July 1, 2004, eSpeed "issued a press release in which it finally disclosed that [its] business was not progressing as previously anticipated."[225] Specifically, this press release disclosed disappointing results for the second quarter of 2004.[226] eSpeed's

---

[223] *Id.* at 1634.

[224] *In re WorldCom, Inc.*, 2005 WL 375314, at *6 (citing *Lentell*, 396 F.3d at 175 n.4).

[225] Complaint ¶ 78.

[226] *See id.*

-63-

stated reasons for these results were competitive pricing pressure and lower than expected market volumes in Europe.[227] A twenty-five percent drop in eSpeed's stock price ensued on July 2.[228]

To plead loss causation based on these facts, plaintiffs first quote an analyst's query to Lutnick on the July 2 conference call, regarding "whether 'on the market share issue,' the losses were due to 'animosity' customers had toward Price Improvement."[229] But plaintiffs then state that "[w]hile Lutnick denied this, the market now understood the truth: eSpeed's slavish adherence to a system detested by its customers might have produced artificial short-term gains, but had finally resulted in a material decline in eSpeed's financial performance."[230]

This conclusory assertion, without more, cannot substitute for specific allegations that disclosure regarding PI was a proximate cause of the

---

[227]   *See id.*

[228]   *See id.* ¶ 79.

[229]   *Id.* ¶ 80 (quotation omitted).

[230]   *Id.* Plaintiffs further assert that "Indeed, the 'competitive pricing pressure' referred to by defendant Lutnick was actually the reality of customers stating their preference for BrokerTec's user-friendly pricing system versus the unpopular and unworkable Price Improvement system." *Id.*

economic loss.[231] But plaintiffs provide some support for the proposition that the market understood the truth about PI by the end of the putative class period, in the form of a *CBS Marketwatch* article discussing the July 2 conference call.[232] The article discussed several reasons for the "alarming rate" of decline of eSpeed's market share, which it chiefly ascribed to a "price war" with BrokerTec – a war that, according to the article, eSpeed was losing due to BrokerTec's incentive program, and Lutnick's failure to "lay out a feasible plan to aggressively compete with [BrokerTec] on pricing and product offerings."[233] Most importantly, the article also asserts that:

> eSpeed has initiated new fees in the last year to pay for added value for customers, but its far from clear these are as attractive as the company expected. [BrokerTec's] pricing, with its fee caps, may be attracting high volume customers, while eSpeed's new charges may be hurting the company's volumes. "The magnitude of the market share deterioration was more than expected. There's been more clarity surrounding the issue of fee caps, and [on] the need to address that issue and possibly adopt similar pricing

---

[231] *See, e.g., Catton v. Defense Tech Sys., Inc.*, No. 05 Civ. 6954, 2006 WL 27470, at *9 (S.D.N.Y. Jan. 6, 2006) (despite plaintiffs' assertion that they "have alleged a factual link between the decline in the Company's stock and defendants' misconduct," action dismissed when "there is no particular allegation in the Complaint directly supporting the theory that the disclosure or the materialization of the concealed risk led to plaintiffs' loss").

[232] *See* Complaint ¶ 81 (extensively quoting article).

[233] *Id.*

-65-

structures," [an analyst] said.[234]

Drawing all reasonable inferences in plaintiffs' favor at this stage of the proceedings, the *CBS Marketwatch* article could establish that, despite Lutnick's specific denial, the market understood by the end of the putative class period what it did not before – that the "new fees" or "new charges" entailed by PI were damaging eSpeed's market share and financial performance.[235] Although the article discusses other possible causes for the stock decline aside from PI, a plaintiff is not required to plead that her economic loss was caused *solely* by the alleged fraudulent scheme.[236] Moreover, *Dura* imposed no requirement that

---

[234]    *Id.*

[235]    *See In re ICQ Commc'ns, Inc. Sec. Litig.*, No. 1:00 CV 01864, 2006 WL 416622, at *10 (D. Colo. Feb. 7, 2006) (although company's explanation for lower earnings did not directly relate to alleged fraud, they "reasonably can be seen as revelation of the negative truth" about defendant's business); *In re Retek Inc. Secs.*, No. Civ. 02-4209, 2005 WL 3059566, at *4 (D. Minn. Oct. 21, 2005) (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005)) (loss causation allegations survived motion for judgment on pleadings where there was "a possible temporal and subject matter connection between the [alleged corrective disclosure] and the previous alleged misrepresentations . . . completely missing in *Dura*"); *cf. Sekuk Global Enters. v. KVH Indus., Inc.*, No. Civ.A. 04-306ML, 2005 WL 1924202, at *17 (D.R.I. Aug. 11, 2005) (loss causation adequately pleaded when defendants' comments accompanying disappointing earnings announcement could be read as attributing poor earnings to subject-matter of alleged scheme).

[236]    *See In re Daou Sys.*, 411 F.3d at 1025; *see also In re GeoPharma*, 399 F. Supp. 2d at 453 (plaintiff not required to exclude other possible causes of loss at pleading stage).

-66-

corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion.[237] For these reasons, plaintiffs have given "some indication of the . . . causal connection [they have] in mind."[238]

### E. Section 20(a)

Plaintiffs also bring allegations against the individual defendants under section 20(a) of the Exchange Act.[239] "However, a primary violation of

---

[237] *See In re Winstar Commc'ns*, No. 01 Civ. 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) ("The Supreme Court [merely] spoke in terms of the 'relevant truth' and the 'truth' making its way into the market place . . . [but] did not address the means by which the information is imparted to the public"); *see also In re Enron Corp. Secs., Derivative and ERISA Litig.*, No. MDL-1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005) ("besides a formal corrective disclosure by a defendant . . . the market may learn of possible fraud from a number of sources [such as] whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.").

[238] *Dura*, 125 S. Ct. at 1634.

[239] *See* Complaint ¶¶ 109-11. Section 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78t(a), states, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.

section 10(b) is a prerequisite to finding control person liability under section 20(a)."[240]  Thus, these claims must be dismissed as well.

### F.  Leave to Amend

Plaintiffs have requested leave to amend the Complaint in the event of dismissal.[241]  Rule 15(a) provides that leave to amend a complaint "shall be freely granted when justice so requires."  Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[242]  Plaintiffs are therefore granted leave to replead within twenty days of this Opinion and Order.[243]

## V.  CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted, without prejudice, with leave to replead within twenty days of this Opinion and Order.  The Clerk is directed to close this motion [#27 on the docket sheet].

---

[240]  *In re GeoPharma*, 399 F. Supp. 2d at 453-54 (citing *Rombach*, 355 F.3d at 177-78).

[241]  *See* Pl. Mem. at 30 n.20.

[242]  *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991).

[243]  *But see supra* Part I.

-68-

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       April 3, 2006

-69-

## - Appearances -

*Counsel for Plaintiffs:*

Samuel H. Rudman, Esq.
David A. Rosenfeld, Esq.
Mario Alba, Esq.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Laurence Paskowitz, Esq.
PASKOWITZ & ASSOCIATES
60 E. 42nd Street, 46th Floor
New York, NY 10165
(212) 685-0969

*Counsel for Defendants:*

Dennis P. Orr, Esq.
Joseph De Simone, Esq.
Matthew D. Ingber, Esq.
MAYER, BROWN, ROWE AND MAW LLP
1675 Broadway
New York, NY 10019
(212) 506-2500